646 F.2d 10
 Toby NASON, Petitioner,
v.
KENNEBEC COUNTY CETA, and F. Ray Marshall, Secretary of
Labor, Respondents.
KENNEBEC COUNTY CETA, A Governmental Agency of the
Department of Labor, Petitioner,
v.
Raymond MARSHALL, Secretary, Department of Labor, Respondent.
 Nos. 80-1433, 80-1454.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 2, 1980.
Decided April 23, 1981.
 
 Joseph M. Jabar, Waterville, Maine, with whom Daviau, Jabar & Batten, Waterville, Maine, was on brief, for petitioner Toby Nason.
 David W. Crook, Dist. Atty., Augusta, Maine, for petitioner Kennebec County CETA.
 Jonathan H. Waxman for Litigation, U. S. Dept. of Labor, Washington, D. C., with whom Carin Ann Clauss and Charlotte M. Brookins, Atty., U. S. Dept. of Labor, Washington, D. C., were on brief, for respondents.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 Toby Nason and Kennebec County CETA petition for review of a final action of the Secretary of Labor upholding Kennebec County CETA's termination of Nason's employment and ordering Kennebec County CETA to restore from non-CETA funds all costs incurred in paying Nason during his employment.[1]
 
 I.
 
 2
 As a "prime sponsor" under the Comprehensive Employment and Training Act, as amended, 29 U.S.C. §§ 801-999 (1978), Kennebec County CETA received federal grants which were in general to be used "to provide job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons " 29 U.S.C. § 801 (1978). In the fall of 1978, Kennebec County CETA advertised an opening for a "job developer," a staff member who would "writ(e) survey reports on the job training contracts, analyze progress reports and check reimbursement vouchers, establish a working relationship with the public and private sector hiring agencies for placement of CETA eligible clients." On November 14, 1978, Toby Nason applied for the position. His resume indicated that in 1976 and 1978 he had been a Democratic candidate for Sheriff of Kennebec County and that he was presently an elected member of the Waterville City Council, his term to expire in 1979. (Waterville, a city in Kennebec County, participated during this period in some programs administered by Kennebec County CETA. See infra.). These "elective positions," Nason noted in the resume, "brought me into contact with many diverse groups in Kennebec County I doubt if there are any groups in Kennebec County unfamiliar to me, and likewise, me to Kennebec County Groups."
 
 
 3
 Nason's application raised concern about the propriety of hiring an active city councilman as a CETA staff member. The Comprehensive Employment and Training Act states that
 
 
 4
 "(a) The Secretary shall not provide financial assistance for any program under this chapter which involves political activities.
 
 
 5
 (b) Neither the program, the funds provided therefor, nor personnel employed in the administration thereof, shall be, in any way or to any extent, engaged in the conduct of political activities in contravention of chapter 15 of Title 5."
 
 
 6
 29 U.S.C. § 833(a), (b) (1978)[2]. This language was largely repeated in then current regulations,
 
 
 7
 "(a) Political activities. (1)(i) No program under the Act may involve political activities. (ii) Neither, the program nor the funds provided therefor, nor the personnel employed in the administration of the program, shall be in any way or to any extent, engaged in the conduct of political activities in contravention of Chapter 15 of Title 5, United States Code (secs. 208(g) and 710)."
 
 
 8
 29 C.F.R. § 98.23(a)(1)(i), (ii).[3] On November 15, 1978, the day after Nason submitted his application, the Executive Director of Kennebec County CETA, James Schoenthaler, called a federal CETA representative in the Boston Regional Office of the Department of Labor and discussed, in general and hypothetical terms, the problems that might attend the employment of a Waterville City Council member by Kennebec County CETA. The representative informed Schoenthaler that she felt such a situation would be "inappropriate," but offered to look into the matter further. Later that day, she called Schoenthaler back to reaffirm her earlier opinion. She referred him to the Department of Labor regulation governing political activity, 29 C.F.R. § 98.23 (old regulations), quoted supra, and to a "field letter" of the Boston Regional Office which warned "that even the mere appearance of CETA involvement in political activities would violate the apolitical nature of the CETA program." Sometime after these two conversations but before Nason was hired, Schoenthaler called John Bailey, the Associate Regional Administrator for Area Operations, to seek his opinion in the matter. His response was the same as that given by the CETA representative.
 
 
 9
 Despite these warnings, Kennebec County CETA hired Nason on December 11, 1978. He had been rated first among some 20 applicants. The Department of Labor was not informed of the decision.
 
 
 10
 On the next day, December 12, Bailey sent Schoenthaler a letter following up on their conversation of November 15, supra, about the propriety of hiring a Waterville City Councilman as a CETA staff member. Citing the pertinent regulations and Boston Regional Office field letters, the letter repeated the earlier warnings: "We would consider the employment of such an individual as you have described to be inappropriate, and subject to possible disallowance of costs." Schoenthaler responded by letter on December 21 and informed Bailey that Nason had already been hired. He went on to say that the official duties and partisan activities of a Waterville City council member were very minimal. Further, he mentioned two safeguards against possible problems with Nason's employment. First, he stated, Nason had agreed to resign from elected office if necessary to comply with the Act and regulations; in addition Nason had been asked, upon the advice of an outside attorney, to "abstain from participation in any CETA related matters which may come before the Waterville City Council." The letter closed asking whether Nason's hiring under these circumstances was a violation of CETA provisions and, if so, which ones.
 
 
 11
 The Boston Regional Office did not immediately reply to Schoenthaler's letter. On January 25, 1979, the Regional Solicitor was asked for an opinion in the matter. He responded on February 1,
 
 
 12
 "Given the facts as presented we are unable to see how the individual could divorce his two (2) roles and not use the CETA position for his political advantage. The location of his CETA position and the nature of the work he is performing, plus his participation in the Council on CETA matters, and his obvious contact with people, his previous history and his background all could give the appearance of engaging in political activity at all times."
 
 
 13
 The Regional Solicitor concluded that a legitimate basis existed "for finding that the employment of this individual is in violation of Section 98.23(a)(1) (i) of the regulations." Quoted supra. Based on this opinion, Bailey formally notified the Kennebec County Commissioners on February 16, 1979 that Nason's employment violated section 98.23(a)(1)(i) of the CETA regulations, and that the costs of Nason's salary and expenses were disallowed. The costs were ordered to be restored to the Kennebec County CETA grant from non-CETA funds. Despite his purported agreement to do so, Nason refused to resign from the Waterville City Council. His employment with Kennebec County CETA was terminated on March 6, 1979.
 
 
 14
 Nason appealed his termination and Kennebec County CETA appealed the disallowance of CETA funding for its expenditures on Nason's employment. Following separate administrative channels, these appeals eventually led to a joint hearing before an administrative law judge (ALJ). On May 1, 1980, the ALJ issued a decision and order upholding both decisions. Following the "restrictive approach" that the Secretary of Labor "has consistently taken" to interpreting the prohibition against the involvement of CETA programs in political activities, see 29 U.S.C. § 833(a) (1978); 29 C.F.R. § 98.23(a)(1)(i) (old regulations), the ALJ stated that the "mere appearance" of CETA involvement in political activities would violate the Act and regulations. When applied to the facts of Nason's case, the ALJ concluded, this rule justified the termination of his employment and the disallowance of Kennebec County CETA's costs.
 
 
 15
 "As a staff person involved in the development of job contracts for CETA programs, Mr. Nason's concurrent membership on the City Council, therefore, constitutes prohibited political activity with (sic) the meaning of the Act and regulations (as well as 'the appearance of CETA involvement in political activities ')."
 
 
 16
 When the Secretary of Labor neither modified nor vacated the ALJ's decision within 30 days, it became the Secretary's final action, 20 C.F.R. §§ 676.91(f), 676.92(a) (new regulations), and so subject to review by this court, 29 U.S.C. § 817 (1978).
 
 II.
 
 17
 Nason and Kennebec County CETA insist that the Secretary was without legal authority to disallow the costs of Nason's employment. The Secretary justifies the action solely on the basis of subsection (a) of 29 U.S.C. § 833 (1978), disallowing "financial assistance for any program under this chapter which involves political activities," and the correlative clause (i) of the Secretary's regulations, 29 C.F.R. § 98.23(a)(1)(i) (old regulations). Subsection (b) and regulations barring personnel from political activities that contravene chapter 15 of Title 5 (the Hatch Act) are not invoked. See 29 U.S.C. § 833(b) (1978); 29 C.F.R. § 98.23(a)(1)(ii) (old regulations).
 
 
 18
 The nub of petitioners' argument is that the provisions relied upon by the Secretary prohibit only programs from involvement in political activities. A CETA program, petitioners say, is not the same as a single administrative staff position such as a job developer, and there is no evidence here that the Kennebec County CETA program ever was actually involved in political activities it was Nason, a CETA staff member, who, arguably, was so involved. The political involvement of CETA personnel is said to be governed exclusively by other provisions of the Act and regulations, 29 U.S.C. § 833(b) (1978); 29 C.F.R. § 98.23(a)(1)(ii) (old regulations), which do not altogether prohibit, but merely restrict, such activity in accordance with the Hatch Act, 5 U.S.C. §§ 1501-08. Nason and Kennebec County CETA therefore ask us to rule that the Secretary's finding that the Act was violated, i. e., that a CETA program was involved in political activities, is not supported by substantial record evidence.
 
 
 19
 Petitioners' argument, while possessing some initial plausibility, founders, in our opinion, because it does not give proper recognition to the Secretary's true rationale. The Secretary construed section 833(a) not only as requiring him to withhold funding from programs actually embroiled in politics but as corollary thereto to withhold funding of those features of a program that create the appearance (and risk) that the program is or will be politically involved. The Secretary reasoned that if Nason were retained by Kennebec County CETA, his dual role as CETA staff member and a politically active member of the Waterville City Council would create the appearance that the Kennebec County CETA program not merely Nason himself was involved in political activities. As the Regional Solicitor explained in his interdepartmental opinion on this matter, supra.
 
 
 20
 "Given the facts as presented we are unable to see how the individual could divorce his two (2) roles and not use the CETA position for his political advantage. The location of his CETA position and the nature of the work he is performing, plus his participation in the Council on CETA matters, and his obvious contact with people, his previous history and his background all could give the appearance of engaging in political activity at all times."
 
 
 21
 The question, therefore, is (1) whether it was within the Secretary's power, under section 833(a) to withhold funding from a CETA program so as to avoid giving the appearance that the program had become politically involved, and, if so, (2) whether the Secretary's decision to withhold funding in Nason's situation was supported by substantial evidence.
 
 
 22
 We think the answer to both of the foregoing questions is in the affirmative.
 
 
 23
 (1) The Secretary's Power to Regulate Program Hiring Policies so as to Avoid the Appearance of Programmatic Political Involvement.
 
 
 24
 When Nason was dismissed, the Secretary's regulations did not contain a specific prohibition against the appearance of political activities in CETA programs, although it would have been within the Secretary's power to have promulgated such a regulation. In both the 1973 and 1978 Acts, Congress granted the Secretary power to "prescribe such rules, regulations, guidelines, and other published interpretations under this chapter as he deems necessary." 29 U.S.C. § 982(a) (1973). Compare 29 U.S.C. § 828(a)(1) (1978). Indeed, in the 1978 Act, which went into effect shortly before the events in question, see note 2, supra, the Secretary was directed to establish,
 
 
 25
 "by regulation such standards and procedures for recipients of funds under this chapter as are necessary to assure against program abuses including, but not limited to, nepotism; conflicts-of-interest; kickbacks; political patronage; the use of funds for political activities; and the use of funds for activities which are not directly related to the proper operation of the program."
 
 
 26
 29 U.S.C. § 825(g) (1978). Regulations implementing the above came out only after the events at issue, see note 3, supra; interestingly, their preamble declares it "extremely important that political activities, including the appearance of political activities, be removed from the CETA program." 44 Fed.Reg. 19,990, 19,993-94 (1979) (emphasis supplied; discussing "participants").
 
 
 27
 While at the relevant time, therefore, no formal regulation existed barring in so many words the appearance of programmatic political involvement, such a prohibition had been written into statements of position formulated and circulated locally by the Secretary's delegates. In Region I Letter No. 25-78, distributed to prime sponsors in early 1978, the Regional Administrator for Employment and Training declared it to be the policy of the Boston Regional Office
 
 
 28
 "to strictly apply the prohibition against CETA involvement in political activities. It is our position that even the mere appearance of CETA involvement in political activities would violate the apolitical nature of the CETA program. Any political activity by any person associated with CETA should be carefully reviewed by prime sponsors to ensure compliance with this policy."[4]
 
 
 29
 Similarly, in his interdepartmental opinion on the matter of Nason's employment by Kennebec County CETA, the Regional Solicitor said,
 
 
 30
 "it is our view that Congress, in enacting CETA, clearly intended to prohibit any indicia of political activity on the part of any individual whose salary is paid with CETA funds. Even the mere appearance of such activity would be detrimental to the apolitical nature of the CETA program."After Nason's termination, the Regional Administrator for Employment and Training, Timothy Barnicle, reiterated the Department's earlier position in a letter to Dr. Kevin Hill, a Kennebec County Commissioner, dated March 16, 1979:
 
 
 31
 "It is our view that Congress clearly intended to prohibit any indicia of political activity on the part of any individual whose salary is paid with CETA funds. Being a candidate for, or being a member of, the City Council, is considered a 'political activity.' "
 
 
 32
 These pronouncements upon the impermissibility of allowing CETA programs to appear to be politically involved, set forth an agency policy formulated on the basis of the agency's construction of section 833(a), and its own regulation tracking that statute, in light of what it sees as a manifest congressional intent. Had the Secretary promulgated this policy expressly in regulations following a notice and comment rulemaking procedure, it would have had the force and effect of law, being based not only on the statute but on the Secretary's delegated powers to legislate by rulemaking, 29 U.S.C. § 828(a)(1) (1978). See Batterton v. Francis, 432 U.S. 416, 425-26 & n.9, 97 S.Ct. 2399, 2405-06 & n.9, 53 L.Ed.2d 448 (1977); Joseph v. Civil Service Commission, 554 F.2d 1140, 1154 n.26 (D.C.Cir.1977); K. Davis, 2 Administrative Law § 7.8 (2d Ed. 1979). However, because the Secretary did not embody in that regulation his prohibition against funding CETA programs that appear to be politically involved, we must determine what effect his policy is to be given in this case and whether his failure to adopt that policy in a notice and comment rulemaking procedure is fatal to its application here.
 
 
 33
 We start with the conclusion, rather easily reached, that the agency's prohibition against the appearance of political involvement by a program is consistent with the declared purposes of the Act and its history. The section 833(a) ban against "providing financial assistance for any program which involves political activities" reflects a continuing congressional concern for the integrity of CETA programs, especially as regards political involvement. This concern was manifested in the earlier as well as the present Act. Compare 29 U.S.C. § 990 (1973) with 29 U.S.C. § 833 (1978). Prior to enactment of the revised Act in 1978, Congress was aware of abuses, which included not only "political patronage in the filling of CETA jobs" but "conflicts of interest." S.Rep.No.891, 95th Cong., 2d Sess. 42, reprinted in (1978) U.S.Code Cong. & Ad.News 4480, 4522 (under heading, "Maintaining the Integrity of the CETA Program.") Given these concerns and this history, it is only logical to assume that Congress intended that section 833(a) be broadly construed by the Secretary to effectuate its purpose.
 
 
 34
 Here those entrusted by Congress with the administration of the Act gave just such a broad construction to the ban on political activities, construing it to encompass even the "mere appearance of CETA involvement in political activities." Letter No. 25-78, supra. As the person charged with funding and monitoring prime sponsors of CETA programs, the Secretary is in the best position to determine what restrictions must be placed upon the hiring of administrative personnel by prime sponsors so as to protect the integrity of CETA programs and effectuate Congress' goal of helping those designated as CETA beneficiaries. In the matters the Secretary and his delegates handle, the appearance and reality of political involvement would seem almost impossible to separate activities giving the appearance of political involvement are by their very nature those that increase the danger of actual involvement, and may as well indicate actual involvement. The example of particular abuses expressly identified by Congress patronage and conflicts of interest are illustrative: employing a politically active staffer may create the appearance that decisions involving, say, CETA program hiring will be affected by political ambition, and this appearance (it could also be called a conflict of interest) corresponds to the enhanced risk in such a situation that political ambition will in fact insinuate itself into the program, thereby involving the program in political activities. Somewhat comparable is the rule almost universally accepted that judges are required not only to decide cases impartially in fact, but also to avoid interest conflicts and the appearance of favoritism as well. Such standards recognize that it is often difficult to distinguish the appearance and reality of impropriety, especially when conflicts of interest might exist. (Bacon, it will be remembered, sought unsuccessfully to justify the taking of bribes by arguing that he never allowed them to influence his judgment and that he took them from both parties.) Construing section 833(a) as prohibiting the appearance of CETA involvement with political activities could reasonably appear to the Secretary a necessity if the statute is to have any real meaning. Otherwise, CETA programs could be staffed with local politicians each proclaiming his total objectivity, while the Secretary would be left to the hopeless task of distinguishing after the fact actual political influence from the mere appearance and possibility thereof.[5]
 
 
 35
 We are aware of the argument that clause (b) of section 833, which forbids CETA personnel from engaging in political activities in contravention of the Hatch Act, 5 U.S.C. §§ 1501-08, should be viewed as a limitation on clause (a), which prohibits political activity in CETA programs. See 29 U.S.C. § 833(b) (1978); 29 C.F.R. § 98.23(a)(1)(ii) (old regulations). Arguably, since clause (b) specifically mentions personnel, it "prevails" over the more general clause (a) and establishes the sole criterion as to the kind of political activity open to CETA employees. Under this argument it was up to the Secretary to show that Nason was in violation of the Hatch Act before declaring him persona non grata.
 
 
 36
 We do not accept this argument. It makes more sense to read the program and personnel provisions of section 833 as operating separately from one another. There is no indication that Congress intended its requirement that personnel refrain from conduct in contravention of the Hatch Act to prevent the Secretary from taking effective measures to keep politics out of CETA programs even if such measures sometimes required employees to desist from political activities that, arguably, were allowed under the Hatch Act.[6] To give separate perhaps even overlapping effect to clauses (a) and (b) of section 833 does not render either of them redundant. For example, had Nason been an elected official of a town outside Kennebec County and so not involved in political activities within the jurisdiction of Kennebec County CETA, it might be that the Secretary could not demonstrate that his employment as a job developer would create the appearance or danger that the Kennebec County CETA program had become involved in political activities. If there was thus no violation of clause (a), the Secretary would have to determine whether Nason's political activities violated the limitation in clause (b) pertaining to the political conduct of personnel. The only time the involvement of personnel in politics would bring clause (a) into play would be where such involvement posed a threat to the apolitical nature of the program itself; when that occurs, we see no evidence of any congressional intention that clause (b) be meant to prohibit a realistic construction of clause (a).
 
 
 37
 In this instance, we believe that the Secretary and his delegates have provided a reasonable and, indeed, on close analysis, perhaps mandatory gloss on the general provisions of the Act and regulations prohibiting funding of CETA programs that involve political activities. 29 U.S.C. § 833(a) (1978); 29 C.F.R. § 98.23(a)(1)(i) (old regulations). No new rule governing the funding of CETA programs has been created; rather, the extant requirements of the Act and regulations have been construed in light of practical realities and congressional design. We conclude that the Secretary's policy pronouncements in regional letters and other communications, see supra, announced what can best be characterized as an "interpretative rule" or "general statement of policy" under the terms of section 553(b)(A) of the Administrative Procedure Act. As such they were well within the authority of the Secretary and his delegates to formulate as they administered the Act and, in particular, as they implemented section 833 and the Secretary's own regulations promulgated thereunder. The APA makes clear that "notice and comment" procedures are not required. Id. "(I)nterpretative rules are statements as to what the administrative officer thinks the statute or regulation means." Gibson Wine Co. v. Snyder, 194 F.2d 329, 331 (D.C.Cir.1952). Compare Gosman v. United States, 573 F.2d 31, 39-40 (Ct.Cl.1978) (citing cases) and Pesikoff v. Secretary, 501 F.2d 757, 763 n.12 (D.C.Cir.), cert. denied, 419 U.S. 1038, 95 S.Ct. 525, 42 L.Ed.2d 315 (1974) (finding agency rules to be interpretative) with Aiken v. Obledo, 442 F.Supp. 628, 648-49 (E.D.Cal.1977) (agency rules found not to be interpretative) (citing cases). An interpretative rule is "not controlling upon the courts." Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). See General Electric Co. v. Gilbert, 429 U.S. 125, 141-42, 97 S.Ct. 401, 410-11, 50 L.Ed.2d 343 (1976). Nevertheless, the Secretary's interpretation of a statute he is supposed to administer is entitled to some deference, see K. Davis, supra, § 7:13, as is his interpretation of the rule he had promulgated, and courts tend to follow an interpretation if satisfied with "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, supra, 323 U.S. at 140, 65 S.Ct. at 164. See Batterton, supra, 432 U.S. at 425 n.9, 97 S.Ct. at 2405 n.9; General Electric, supra, 429 U.S. at 141-42, 97 S.Ct. at 410-11. See generally K. Davis, supra, §§ 7:8-:14. In the present instance, Congress gave the Secretary and his delegates the difficult practical task of keeping CETA programs free from political involvement and corruption. The Secretary's construction of what this mandate reasonably means and requires is entitled to weight, since he is the person who must translate it into reality. As the Secretary's interpretation in this instance was fully authorized under the Act, within the Secretary's administrative expertise and, as we have explained at length, amply justified, we believe it should be given effect.
 
 
 38
 In the circumstances of the present case, the Secretary's rule against funding programs that appear to be involved in political activities is not rendered unenforceable for lack of formal promulgation. Being merely an interpretation, no problem arises from the Secretary's failure to embody the rule in formal regulations adopted under notice and comment procedures. Though the Act incorporates the notice and comment provisions of the Administrative Procedure Act, 5 U.S.C. § 553, see 29 U.S.C. § 982(a) (1973); 29 U.S.C. § 828(a)(1) (1978), the APA exempts "interpretative rules" and "general statements of policy" from the rulemaking procedures laid down in section 553. 5 U.S.C. § 553(b)(A). See Guardian Federal Savings & Loan Association v. Federal Savings & Loan Insurance Corp., 589 F.2d 658 (D.C.Cir.1978); Gosman, supra, 573 F.2d at 39-40; Pesikoff, supra, 501 F.2d at 763 n.12. We perceive no unfairness in this result that would cause us to seek a basis outside the APA for imposing a hearing requirement. See K. Davis, supra, §§ 7:16-:19. This is not a case in which an agency has informally adopted a policy that affects the rights of the beneficiaries of the program it administers. See note 9, infra. On the contrary, the Secretary's prohibition relates merely to the eligibility of CETA sponsors for federal funds and to a goal political neutrality already announced in a statute. Upon receipt, these funds are to be used on behalf of the "economically disadvantaged, unemployed, or under-employed." 29 U.S.C. § 801 (1978). In a sense, therefore, the Secretary is acting here as the administrator of a unitary, cooperative endeavor composed of the Department of Labor and CETA prime sponsors. Further, and most important, we find the Secretary's interpretation is so intertwined with the manifest purpose and requirements of the statute and regulations that it falls within his prerogative to make.[7] There is nothing so surprising or controversial in this interpretation as to "merit the safeguards of notice and comment procedures" independent of the APA. R. Stewart & S. Breyer, Administrative Law 479-80 (1979).
 
 
 39
 Nor do we think it fatal that the interpretative rule was not published in the Federal Register pursuant to section 982(a) (1973) or 29 U.S.C. § 828(a)(1) (1978). Enormous difficulties would be created if every interpretive or policy statement of an agency had to be published. Moreover, even were publication called for, its absence would not invalidate an otherwise proper rule where the party adversely affected had "actual and timely notice." 5 U.S.C. § 552(a) (1). See Central Arkansas Auction Sale, Inc. v. Bergland, 570 F.2d 724, 728 n.3 (8th Cir.), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1121 (1978); Whelan v. Brinegar, 538 F.2d 924, 927 (2d Cir. 1962); United States v. Aarons, 310 F.2d 341, 347-48 (2d Cir. 1962); Rodriguez v. Swank, 318 F.Supp. 289, 295 (N.D.Ill.1970) (3-judge court), aff'd, 403 U.S. 901, 91 S.Ct. 2202, 29 L.Ed.2d 677 (1971).[8] Here, Kennebec County CETA was told on numerous occasions of the rule against the appearance of CETA program involvement in political activities. The rule was described in at least one regional field letter, in telephone conversations with a field representative and the Associate Regional Administrator, and in a subsequent letter from the Associate Regional Administrator. To what extent Nason learned about the rule is less material the rule concerned funding for CETA programs and was directly enforced only against Kennebec County CETA. (Nason was, of course, not a beneficiary of CETA he was an employee, not a person whom CETA was established to benefit.)[9]
 
 
 40
 (2) The Secretary's Ruling in the Present Case Is Supported by Substantial Evidence.
 
 
 41
 On the facts before us, we find substantial evidence to support the Secretary's determination that Nason's employment created the appearance that the Kennebec County CETA program was involved in political activities. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938); see also Currier v. Secretary, 612 F.2d 594, 597 (1st Cir. 1980). It is not disputed that in 1976 and 1978 Nason was an unsuccessful Democratic candidate for Kennebec County Sheriff. In December 1977, he was elected to the Waterville City Council and remained in office during his employment as a job developer for Kennebec County CETA. The ALJ specifically credited testimony of Richard Carey, a former City Councilman and Mayor of Waterville from 1970 through 1978, to the effect that the Waterville City Council sets policy, enacts ordinances, adopts the annual budget and has the power to impose real estate taxes. According to Carey, the mayor can veto Council decisions, but the Council can override the veto by a vote of five of its seven members. Although members of the City Council cannot participate in the hiring and firing of personnel, Carey indicated that they remain free to recommend appointments to the mayor.
 
 
 42
 James Schoenthaler, Executive Director of Kennebec County CETA, testified that in 1978 the City of Waterville was involved in programs administered by Kennebec County CETA, specifically public service employment and youth programs. As described in an advertisement (and confirmed by Schoenthaler's testimony), Nason's position as a job developer for Kennebec County CETA in part required him to establish "a working relationship with the public and private sector hiring agencies for placement of CETA eligible clients."
 
 
 43
 Based on this evidence, it would be reasonable to conclude that Nason's hiring created an appearance of CETA involvement in political activities. Nason's three campaigns for elective office in the three years prior to his hiring strongly suggest a desire to be active in local politics. His dual role as Waterville City Councilman and CETA job developer could reasonably be perceived as affording him a means to promote that goal. It may well have seemed that Nason would influence either Waterville city policy toward the CETA program or the distribution of CETA positions so as to advance his own political interests. Even if in fact Nason scrupulously avoided abusing his concurrent positions, there is substantial evidence to support the Secretary's determination that Nason's employment by Kennebec County CETA created an appearance of political activities having been interjected into the CETA program. Having justifiably found that a violation of the Act existed, the Secretary properly upheld Nason's termination, disallowed the expenses of Nason's employment and ordered that Kennebec County CETA restore the expenses to its federal grant from non-CETA funds. See 29 U.S.C. § 816(a), (b), (d) (1978).
 
 III.
 
 44
 Our conclusion in Part II, supra, disposes of all but one of the issues raised by petitioners. The question still to be decided is whether, as argued by Kennebec County CETA, the Secretary is estopped from disallowing the expenses of Nason's employment due to his delay in informing Kennebec County CETA that Nason's hiring violated the Act. Nason was hired on December 11, 1978 and the expenses of his employment were formally disallowed on February 16, 1979. In the intervening two months, Kennebec County CETA incurred expenses of $3,009.91 in relation to Nason's employment.
 
 
 45
 Although we express no opinion on the ALJ's determination that Kennebec County CETA intentionally disregarded the Secretary's advice in the matter of Nason's employment, we fully agree with him that Kennebec County CETA was adequately and timely informed of the impropriety of hiring Nason as a CETA staff member. We have already described the warnings received by Kennebec County CETA prior to and shortly after Nason's hiring. See part II, supra. When, on December 21, 1978, Kennebec County CETA informed the Department of Labor that Nason had been hired, the Department took steps to determine a proper course of action. On January 25, 1979, the Regional Solicitor was asked for an opinion in the matter. His response, indicating that a legitimate basis existed for finding a violation, came on February 1. On February 16, the costs of Nason's employment were formally disallowed.
 
 
 46
 Despite the unambiguous warnings of the Department of Labor, Kennebec County CETA hired and retained Nason. The Department's response, though not immediate, came within a reasonable time. There is no basis in this case on which to estop the Secretary from disallowing the costs of Nason's employment.
 
 
 47
 The petitions for review are denied.
 
 
 
 [1]
 We allowed the petitioners to file a consolidated appendix and the respondent to submit a consolidated brief, and now treat the petitions together
 
 
 [2]
 The Comprehensive Employment and Training Act was extensively amended in 1978. The amendments became effective October 27, 1978 and so govern this case. However, the pre-1978 version of the Act is pertinent to our analysis and so will frequently be mentioned. Citations to the Act as currently written appear as: 29 U.S.C. § -- (1978). Citations to the Act as previously written appear as: 29 U.S.C. § -- (1973)
 
 
 [3]
 Three sets of regulations dealing with political activities are relevant to this case:
 (1) The regulations promulgated under the 1973 version of the Act, see 29 U.S.C. § 982(a) (1973), remained in effect through January 1979. They were thus in effect at the time Nason was hired by Kennebec County CETA.
 (2) Pursuant to a 1978 amendment to the Act, directing that new regulations be promulgated "relating to the prohibition of fraud and other abuses in connection with the administration of programs under (the) Act," Pub.L.No.95-524, § 4(b), 92 Stat. 2018-19 (1978), the Secretary published a set of "transitional regulations" in the Federal Register on December 29, 1978. 43 Fed.Reg. 61,130, 61,132-33 (1978). The transitional regulations took effect on January 26, 1979, approximately two weeks before Nason was fired.
 (3) The Secretary published final regulations governing fraud and other abuses on April 3, 1979, 44 Fed.Reg. 19,990, 20,027-31 (1979), corrected, 44 Fed.Reg. 28,654 (1979). These took effect well after the events in this case, but are useful in interpreting the earlier sets of regulations.
 The Secretary has assumed that the old regulations govern this case and petitioners do not challenge the assumption. However, because the transitional prohibition on programmatic political involvement ("No program may involve partisan or nonpartisan political activities," 29 C.F.R. § 93.4(i)), is virtually the same as the prohibition in the previous regulations, we need not decide whether the Secretary ought to have grounded his decision on the transitional, rather than older regulations. For convenience, we will follow the parties and analyze the case under the old regulations, which are those quoted in text.
 Citations to the different sets of regulations will appear as follows: 29 C.F.R. § 98. (old regulations); 29 C.F.R. § 93. (transitional regulations); 20 C.F.R. § 676. (new regulations).
 
 
 [4]
 There are indications in the record that other field letters of similar import were distributed to prime sponsors by the Boston Regional Office, but the letters were not included in the record and so are not before us
 
 
 [5]
 In 1978, there were 447 prime sponsors under the Act. See S.Rep., supra, at 5, reprinted in U.S.Code Cong. & Ad.News, supra, at 4485. For the Secretary to permit such sponsors to give the appearance of political involvement, as by hiring active political figures to serve as job developers, would seem tantamount to allowing such programs to become politically involved
 
 
 [6]
 We express no opinion on the question whether, in the absence of apparent programmatic political involvement, Nason's employment would have been permissible under the statute, 29 U.S.C. § 833(b) (1978), and regulations, 29 C.F.R. § 98.23(a)(1)(ii) (old regulations). Compare 5 U.S.C. § 1502(c)(4) with Northern Virginia Regional Park Authority v. Civil Service Commission, 437 F.2d 1346, 1351-52 (4th Cir.), cert. denied, 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717 (1971) and In re Higginbotham, 340 F.2d 165 (3d Cir.), cert. denied, sub nom. Higginbotham v. Civil Service Commission, 382 U.S. 853, 86 S.Ct. 101, 15 L.Ed.2d 91 (1965)
 
 
 [7]
 Because the Secretary's rule is a construction of extant provisions in the CETA Act and regulations, see supra, it does not create an independent "condition for receipt of financial assistance" that would be subject to the notice and comment procedures of the APA. See 29 U.S.C. § 828(a)(1) (1978)
 
 
 [8]
 While the requirement that "(a)ll such rules, regulations, guidelines, and other published interpretations or orders under this chapter shall be published in the Federal Register at least thirty days prior to their effective date," is derived from the CETA statute, not the APA, the latter is referred to and utilized by the Act, see especially 29 U.S.C. § 982(a) (1973); 29 U.S.C. § 828(a)(1) (1978). Against a person with actual notice, we see no reason why failure to publish should affect the enforcement of an otherwise proper rule
 
 
 [9]
 This case is distinguishable from Morton v. Ruiz, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), in which the Supreme Court declared that the failure to publish eligibility requirements in the Federal Register or Code of Federal Regulations left the requirements without effect. There, the agency (the Bureau of Indian Affairs) failed to comply with its own, formally adopted publication policy; second, the eligibility requirements at issue would have extinguished the "entitlement" of individuals otherwise eligible for federal benefits; and lastly, the eligibility requirements were at odds with the congressional purpose behind the statute. See 415 U.S. at 230-38, 94 S.Ct. at 1072-76. None of these factors is present here