**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Dominick MUSELLA, et al., Defendants.**

**No. 83 Civ. 342 (KMW).**

United States District Court,
S.D. New York.

April 8, 1993.

As Corrected April 12, 1993.

William H. Kuehnle, Washington, DC, for plaintiff S.E.C.

Jonathan C. Scott, Northport, NY, for defendant Albert DeAngelis.

## OPINION AND ORDER

KIMBA M. WOOD, District Judge.

Plaintiff, the Securities and Exchange Commission, ("Commission") moves for an order holding defendant Albert DeAngelis in civil contempt. Magistrate Judge Grubin recommends that I hold defendant DeAngelis in civil contempt and recommends that I require him to meet certain conditions in order to purge his contempt. Mr. DeAngelis objects to Magistrate Judge Grubin's Report

and Recommendation ("Report"). On *de novo* review, I adopt Magistrate Judge Grubin's Report in its entirety for the reasons stated below.

## I. PROCEDURAL BACKGROUND

Magistrate Judge Grubin's Report relates the facts relevant to this action. I will repeat them here only to the extent necessary.

This court's Final Judgment and Order entered on September 28, 1989 required Mr. DeAngelis to disgorge profit from trading in securities on inside information. The profit and prejudgment interest totalled $615,-918.82 and was due thirty days from the date judgment was entered. The Court of Appeals affirmed the Final Judgment and Order, and the United States Supreme Court denied a petition for a writ of certiorari on October 1, 1990.

Following defendant's failure to comply with the judgment, the Commission moved for a judgment of civil contempt against Mr. DeAngelis on November 16, 1990. After an evidentiary hearing on October 8, 1991, Magistrate Judge Grubin ordered Mr. DeAngelis to make interim payments of $1,500.00 per month until further order of the court. The hearing resumed on January 23, 1992 after defendant requested an opportunity to present additional evidence. Magistrate Judge Grubin submitted her Report on October 29, 1992.

## II. DISCUSSION

Mr. DeAngelis objects to the Report on two grounds. First, he argues that he should not be held in contempt of court because it was impossible for him to comply with the September 28, 1989 order. Second, he argues that even if he is in contempt, the conditions for purging his contempt recommended by Magistrate Judge Grubin are unreasonable.

### A. *Civil Contempt of Court*

A court may exercise its inherent power to enforce compliance with a lawful order by holding a party in civil contempt when 1) the order is clear and unambiguous;

2) proof of noncompliance is clear and convincing; and 3) the party has not been reasonably diligent and energetic in attempting to comply with the order. *See, e.g., EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice–Journeyman Educ. Fund,* 925 F.2d 588, 594 (2d Cir.1991).

■ Mr. DeAngelis does not dispute that he has failed to comply with this Court's September 28, 1989 order. However, he argues that it was factually impossible for him to pay the entire amount ordered. Mr. DeAngelis has the burden of coming forward with evidence showing financial inability to comply. *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983).

Mr. DeAngelis objects to Magistrate Judge Grubin's recommendation that Mr. DeAngelis' failure to make periodic payments of smaller amounts to the extent of his financial ability precludes a defense of inability to pay. Although it is true that "a contempt citation cannot be based on a vague and uncertain order," *In re BiCoastal Corporation,* 129 B.R. 283, 285 (M.D.Fla.1991), the order in this case was clear and unambiguous.

■ When an order requires a party to pay a sum certain, a mere showing that the party was unable to pay the entire amount by the date specified is insufficient to avoid a finding of contempt. When a party is absolutely unable to avoid a finding of contempt. When a party is absolutely unable to comply due to poverty or insolvency, inability to comply is a complete defense. *See Badgley v. Santacroce,* 800 F.2d 33, 37 (2d Cir.1986). Otherwise, the party must pay what he or she can. *See Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1214 (S.D.Fla.1986) ("a person subject to court order must comply to the fullest extent possible, regardless of whether such efforts result in compliance in whole or in part").

■ Mr. DeAngelis' offer to the Commission to pay $50,000 over five years in full satisfaction of the Judgment, which was not accepted, and his compliance with Magistrate Grubin's interim order directing monthly payments of $1,500 cannot be characterized

as a reasonably diligent and energetic attempt to comply. Mr. DeAngelis is able to pay more, and he may be held in contempt for his failure to do so. Mr. DeAngelis has made no showing that he incapable of making any payment, nor has he paid that portion of the amount that he is able to pay. Furthermore, he has not requested that the Court clarify or modify of the order. *See McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 192, 69 S.Ct. 497, 500, 93 L.Ed. 599 (1949); *Powell v. Ward,* 643 F.2d 924, 932 (2d Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981). In short, he has not "in good faith employed the utmost diligence in discharging his … responsibilities." *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 713 (D.C.Cir.1974).

### B. *Requirements for Purging Contempt*

■ Mr. DeAngelis next objects that even if he is in contempt, Magistrate Judge Grubin's recommendations as to how he may purge his contempt are unreasonable. First, he protests that he does not have the means to make a $100,000 lump-sum payment. If this is so, Mr. DeAngelis may comply in the alternative by transferring his ownership interest in the motel note.

■ Mr. DeAngelis' objection that transfer of the motel note will result in a fifty percent reduction in the income received by him and his wife demonstrates his misunderstanding of this contempt proceeding. He has been ordered by this court to disgorge money that he gained illegally through insider trading in securities. He must pay what he is capable of paying, even if making the payment results in a diminution of his income or his relatively comfortable standard of living. Contrary to Mr. DeAngelis' assertion, the extent to which Mr. DeAngelis' assets and income would be exempt from attachment under New York law does not alter his duty to pay the amount he owes under the order. *See Badgley v. Santacroce,* 800 F.2d 33, 37–38 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (judgment of federal court must be respected even if compliance violates state law).

As Magistrate Judge Grubin observed, Mr. DeAngelis could raise the required funds by selling or renting the Florida condominium, by selling or using income from DeAngelis Jewelers, or by renting out the second-family apartment that is currently being occupied rent-free by his gainfully employed 22–year–old grandson. Noting that his wife has an interest in these assets, Mr. DeAngelis compares the situation to cases in which the contemnor was being used "as a 'hostage' to put pressure on third parties interested in his release from contempt." *See United States v. International Brotherhood of Teamsters,* 899 F.2d 143, 147 (2d Cir.1990). This is not such a case. Although Mrs. DeAngelis owns a fifty percent share of the DeAngelis' Queens home and their Florida condominium and is the full owner of the jewelry store, use of these assets is perfectly appropriate when her husband's income fully supports her and when funds from the jewelry store helped to finance Mr. DeAngelis' insider trading.

Moreover, by reducing his expenses, Mr. DeAngelis would be capable of purging his contempt without a substantial impact on his wife's interest in the two residences and the store. Mr. DeAngelis objects that he would not be capable of making the $2,000 monthly payments, even after reducing his discretionary spending. In support of this contention, he attaches to his objections statements of cash receipts and disbursements compiled by John C. Reseska, a certified public accountant. Exhibit C to Mr. Reseska's statements purports to show that with certain reductions

in discretionary spending, Mr. DeAngelis would still have a $2,211 excess of cash disbursements over receipts if he were required to pay $2,000 per month to purge his contempt. However, I find that with further reductions in discretionary spending, Mr. DeAngelis would be able to make the payments. The necessary reductions could be achieved immediately without requiring Mrs. DeAngelis to mortgage her interest in her Queens home or to sell DeAngelis Jewelers to her daughter and son-in-law.

For example, by limiting his total auto expenses (including lease and loan payments, insurance, maintenance and gas) to the amount of his auto reimbursement, Mr. DeAngelis could save an additional $668 per month.[1] By extending payment of his credit card debt over a 48 month period instead of a 12 month period, he could save another $788 per month.[2] By selling his interest in the vacation condominium or by renting it out for part of the year, he could eliminate his entire share of the expenses related to the residence, which comes to $231 per month.[3] Finally, he could close the $2,211 per month shortfall projected by the accountant by making an additional reduction of $524 per month in his combined telephone, clothing, food and entertainment expenses.[4] This could be achieved through elimination of the second telephone in the DeAngelis home, deferment of clothing purchases, and reduction in food and entertainment expenses. These reductions could be temporary, because, as Magistrate Judge Grubin noted, additional funds will become available in one

---

1. This figure is the difference between defendant's monthly auto reimbursement ($650) and the sum of his projected disbursements for auto-related items, i.e., economy car auto lease ($300), mercury auto loan ($384), auto insurance ($250), auto maintenance ($167) and auto gas ($217).

2. This figure is the difference between the accountant's estimated credit card disbursement ($1050) and the disbursement that would be required if payment were based on a 48–month schedule ($12,600 divided by 48 or $262.50). The accountant's estimate of a $1,050 per month credit card payment contemplates a 12–month paydown of the existing $12,600 debt. However, it appears that DeAngelis' minimum payment is based on at least a 48–month paydown. At the January 23, 1992 hearing before Magistrate Judge Grubin, Lawrence Hoffman, who is the

DeAngelis' son-in-law and helped prepare their income tax returns, testified that DeAngelis had an $11,500 credit card debt with minimum monthly payments of $225. Tr. at 65–66.

3. This figure is the sum of the projected monthly disbursements for condo maintenance ($111), condo taxes ($95) and condo utilities ($25).

4. According to Exhibit A of Mr. Reseska's report, in 1992 DeAngelis spent approximately $200 a month on telephone bills, $1,250 per month on food and entertainment, and $250 per month on clothing. Exhibit C of the report estimates that telephone and clothing expenses would remain the same but that food and entertainment costs could be reduced to $800 per month with the reduction of certain discretionary items.

to two years as the car loan and mortgage are paid off.

## III. CONCLUSION

For the foregoing reasons, I find, on *de novo* review, that Mr. DeAngelis is in contempt of this Court's Final Judgment and Order of September 28, 1989.

In order to purge his contempt, Mr. DeAngelis is required to do the following: First, within ninety (90) days of the date of this order, he shall pay to the Clerk of Court $100,000. In the alternative, he may transfer to the Commission within ten (10) days of the date of this order his entire right to principal and interest on the Motel Montreal mortgage note he owns. Second, he shall pay $2,000 to the Clerk of Court at the end of each month commencing on April 30, 1993 and continuing on the last day of each month until further order of the Court. The $2,000 payment will also satisfy Magistrate Judge Grubin's October 8, 1991 order to make payments of $1,500 per month. Third, he shall be enjoined from disposing of or encumbering in any way his interest in his home without further order of the Court. Fourth, he shall provide a financial statement to the Court every six months, under oath, showing household income and expenses and shall also provide his yearly tax returns.

SO ORDERED.

## REPORT AND RECOMMENDATION TO THE HONORABLE KIMBA M. WOOD

GRUBIN, United States Magistrate Judge:

This is a report and recommendation on the motion filed herein by plaintiff, the Securities and Exchange Commission, for an order holding defendant Albert DeAngelis in civil contempt.

## BACKGROUND

On August 8, 1989 your Honor filed an Opinion after trial that DeAngelis had violat-

ed the federal securities laws by trading on inside information and ordered that he was to disgorge all profits together with prejudgment and postjudgment interest. A Final Judgment and Order was entered on September 28, 1989 (hereinafter "Judgment"). Payment was due within 30 days. The amount of profit was $362,536.01 and prejudgment interest came to $253,382.81, for a total of $615,918.82. Although DeAngelis did not seek a stay of the Judgment nor make payment of any kind, he appealed the decision. The Second Circuit affirmed your Honor's Judgment, and DeAngelis filed a petition in the United States Supreme Court for a writ of certiorari which was denied on October 1, 1990.

The SEC filed its instant motion for contempt on November 16, 1990 and DeAngelis responded by claiming an inability to pay, and your Honor thereafter referred the matter to me. On October 8, 1991, an evidentiary hearing was held at which DeAngelis presented himself as his only witness and his tax returns for 1988 through 1990 as his only documentary evidence. After the hearing I indicated that, because he was unable to present any meaningful explanation of his financial circumstances, DeAngelis had failed to sustain his burden of showing an inability to make any payment. DeAngelis then requested the opportunity to present further evidence, and the hearing was resumed on January 23, 1992.[1]

At the resumed hearing testimony was given by the attorney who had represented DeAngelis in the trial before your Honor, by DeAngelis's son-in-law who has prepared his tax returns since 1983 and by DeAngelis's wife, and further documentary evidence was received. Thereafter, a report on the value of the house owned by DeAngelis and his wife was made by a court-appointed real estate expert. DeAngelis submitted supplemental material in August to which the SEC responded last month. The SEC now proposes on the basis of the evidence presented that DeAngelis be found in contempt and ordered to make a lump sum payment of

---

1. As it was clear DeAngelis was able at least to make monthly payments in limited amounts, I entered an order requiring interim payments of

$1,500 per month commencing October 31, 1991. DeAngelis has been making those payments since that time.

$100,000 and continuing monthly payments of $2,000. The SEC also requests that he be enjoined from selling or encumbering his home without further order of the court. Because I find, for the reasons set forth below, that the relief requested is warranted and, indeed, quite reasonable, I recommend that it be granted.

### FACTS

DeAngelis is a 69–year–old retiree who goes daily to his Union headquarters to act as a delegate. He receives no salary, but does receive $150 per week from the Union as "automobile reimbursement" to cover his car expenses for traveling daily to the Union.[2] He lives with his wife and supports her. A 22–year–old grandson lives with them who, although gainfully employed, does not contribute to household expenses. DeAngelis's income consists annually of his pension of $49,365, Social Security of about $7,000, payments on the sale of Motel Montreal, which is a property in Lake George that had been partly owned by him, of $17,333 in principal and $10,920 in interest, and the $7,800 in automobile reimbursement. Mrs. DeAngelis also receives her own Social Security of about $5,000.[3] DeAngelis claims to have no savings and to have lost all the profits he made on his insider trading through subsequent stock market transactions prior to entry of the Judgment. Broken down monthly, the total household income from the above sources is $8,152 per month. DeAngelis's listing of household expenses totals $82,939 annually, or $6,911 per month. Based on the foregoing, DeAngelis contends that the difference between income and expenses, which comes to available cash of $1,241 per month, is insufficient to enable him to comply with the Judgment in the manner proposed by the SEC. He proposes that his obligation be met by simply continuing the $1,500 monthly payment he is now making pursuant to my order last October

which, he contends, already creates a great hardship. I find his position untenable.

### DISCUSSION

#### I.

A party may be held in civil contempt for the failure to comply with an order of the court if (1) the order was clear and unambiguous, (2) proof of noncompliance is clear and convincing, and (3) the party has not been reasonably diligent and energetic in attempting to do what was ordered. *See EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice–Journeyman Educ. Fund,* 925 F.2d 588, 594 (2d Cir.1991); *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *EEOC v. Local 638 . . . Local 28 of Sheet Metal Workers' Int'l Ass'n,* 753 F.2d 1172, 1178 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986); *Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.) (per curiam), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981).

There is no doubt here that DeAngelis is in contempt of your Honor's Final Judgment and Order. Its requirement of disgorgement was clear and unambiguous, and it is not in dispute that he paid not one penny of the amount until my order last year requiring $1,500 monthly. What DeAngelis appears to argue is that he has been "reasonably diligent and energetic," *see EEOC v. Local 580, Int'l Ass'n of Bridge, Structural & Ornamental Ironworkers, Joint Apprentice–Journeyman Educ. Fund,* 925 F.2d at 594, in attempting to comply with the Judgment to the best of his ability. He contends that since the time of the Judgment he has been unable financially to comply with it but has acted in good faith through his attorneys to resolve the matter. He says that he believed

2. Insofar as the Union office is close to his home—indeed, he returns home mid-morning for a cup of coffee—the "reimbursement" is rather excessive.

3. These amounts are mostly, of necessity, approximate. They are as set forth in DeAngelis's own "Household Cash Inflow/Outflow State-

ment" (Ex. 3) prepared in January by his son-in-law. Presumably, the pension and Social Security amounts have and/or will increase, while the interest payments on the motel will decrease over the remaining five years of the mortgage he holds.

his attorneys would work something out with the SEC and that the matter was therefore under control. According to DeAngelis's attorney, shortly after the Judgment was entered, he contacted the SEC, told it DeAngelis could not pay the amount required, and offered to pay $50,000 over five years in full satisfaction of the $615,918.82. That offer was refused by the SEC. After the Second Circuit rejected DeAngelis's appeal of this Court's decision, his attorney made the same offer of $50,000 again. The offer was again rejected outright by the SEC. Then, DeAngelis's petition for certiorari was denied by the United States Supreme Court, and when the SEC staff attorney contacted DeAngelis's attorney asking about payment, the same $50,000 offer was made. DeAngelis's attorney says the matter was left open at that point, although the SEC claims otherwise— that, as previously, the offer was rejected. (The SEC's position on what happened at this point is, of course, far more plausible, since there is no apparent reason why it would have taken under consideration, *after* all avenues of appeal for DeAngelis had been exhausted, an offer that it had seen fit to reject soundly earlier.) In any event, DeAngelis was told by his attorney that the offer had not been accepted, yet DeAngelis did nothing further because, he claims, he thought his attorney would "work it out," so he simply waited to hear from him.

Even accepting the foregoing explanation by DeAngelis, it is insufficient to avoid a finding of contempt. The party seeking a finding of contempt need not show that violation of the order was willful, and good faith is not a defense. Nor may the alleged contemnor rely on his own inadvertence, misunderstanding or advice from counsel. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *EEOC v. Local 638 ... Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d at 1178; *Donovan v. Sovereign Sec., Ltd.*, 726 F.2d 55, 59 (2d Cir.1984); *NLRB v. Maine Caterers, Inc.*, 732 F.2d 689, 690 (1st Cir. 1984); *TWM Mfg. Co. v. Dura Corp.*, 722 F.2d 1261, 1273 (6th Cir.1983), *cert. denied*, 479 U.S. 852, 107 S.Ct. 183, 93 L.Ed.2d 117 (1986); *NLRB v. Blevins Popcorn Co.*, 659 F.2d 1173, 1183, 1184, 1186 (D.C.Cir.1981);

*Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 785 n. 11 (7th Cir.1981); *NLRB v. J.P. Stevens & Co.*, 563 F.2d 8, 16 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 547 F.2d 575, 581 (D.C.Cir.1976), *cert. denied sub nom. Angle v. NLRB*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); *NLRB v. Ralph Printing & Lithographing Co.*, 433 F.2d 1058, 1062 (8th Cir.1970), *cert. denied*, 401 U.S. 925, 91 S.Ct. 883, 27 L.Ed.2d 829 (1971). In *NLRB v. J.P. Stevens & Co.*, the Second Circuit explained as follows:

> Respondents argue, however, that, even if there were violations of the order, the violations were not willful, and they maintain that they should not be found in civil contempt unless they acted with deliberate or careless disregard of our prior order. This contention ... misconstrues the purpose of a civil contempt proceeding where the contemnor is offered the opportunity to purge himself of contempt by complying with prescribed purgation conditions.

> In this context, the long-standing rule is that good faith or lack of wilfulness is not a defense that the petitioner must negate. The rule is a salutary one, for the purpose of a motion for civil contempt ... "is not to punish intentional misconduct, but rather to enforce compliance with an order of the court and to remedy any harm inflicted on one party by the other party's failure to comply."

563 F.2d at 16 (quoting *Oil, Chemical & Atomic Workers Int'l Union v. NLRB*, 547 F.2d at 581 (citations omitted)). DeAngelis appears to claim that his belief that it was sufficient to pay nothing while awaiting further negotiations by his attorney was based on his attorney's advice. But advice of counsel has never been a defense to contempt. In *United States v. Goldfarb*, 167 F.2d 735 (2d Cir.1948) (per curiam), the defendant failed to appear to testify in response to a grand jury subpoena, although, at the designated time, his attorney appeared at the grand jury room and informed the Assistant United States Attorney that the defendant could not be there because of an important

business engagement but was willing to appear on another day. The defendant was held in contempt and, on appeal, the Second Circuit affirmed the holding, noting that the defendant's expectation that his attorney would obtain an adjournment was an insufficient defense:

> ... [A]lthough he may have expected the attorney to obtain a continuance he voluntarily took the risk of not obtaining one. Even advice of counsel is not a defense to an act of contempt although it may be considered in mitigation of punishment.

167 F.2d at 735. *See also TWM Mfg. Co. v. Dura Corp.*, 722 F.2d at 1273 ("advice of counsel and good faith do not relieve from liability for a civil contempt, although they may affect the extent of the penalty" (quoting *Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder Co.*, 230 F. 120 (6th Cir. 1916))); *SEC v. First Financial Group of Texas, Inc.*, 659 F.2d 660, 670 (5th Cir.1981) ("Reliance upon advice of counsel may be considered in mitigation of the sanction but does not constitute a defense to contempt of court."); *Nasco, Inc. v. Calcasieu Television & Radio, Inc.*, 583 F.Supp. 115, 120 (W.D.La. 1984) ("Whether respondents acted upon advice of counsel is no defense to civil contempt.") Indeed, the Second Circuit has recently expressly rejected good faith reliance on advice of counsel even as a defense to the specific intent requirement in the criminal contempt context. *United States v. Remini*, 967 F.2d 754, 757–58 (2d Cir.1992) ("[I]t is the established law of this circuit that 'advice of counsel is not a defense to [an] act of contempt, although it may be considered in mitigation of punishment.'" (quoting *United States v. Goldfarb*, 167 F.2d at 735)).

It is additionally worth noting, though, that DeAngelis's behavior does *not* evidence either good faith or diligence in attempting to comply with your Judgment or with prior orders of this Court. In January 1983, shortly after this action was filed, a preliminary injunction was issued by Judge Haight on consent, requiring that pending the final determination of the action DeAngelis and his agents "hold and retain within their control, and otherwise prevent any disposition or dissipation of, funds or other assets with a net value of $360,425 [the amount then thought to represent his direct profits from illegal trading]" in securities in his two brokerage accounts. It required that he preserve the equity in his house to the extent of the difference between $360,425 and the net value of his brokerage accounts. It further provided that DeAngelis not engage in certain types of activities, including the purchase or sale of options, to lessen the risk of dissipation of the profits. However, subsequent trial testimony of brokerage account executives revealed that DeAngelis withdrew tens of thousands of dollars from the accounts in 1985 and 1986 and then he engaged in options trading in 1988, eventually dissipating all the assets so that there remained no funds for collection.

His actions with respect to his residence are another example of the cavalier attitude with which DeAngelis skirts his obligations to the Court. The record shows that at trial before your Honor in 1989 after the SEC proposed to present certain testimony concerning the dissipation of the funds in DeAngelis's brokerage account, his counsel, to obviate the testimony, represented after consultation with DeAngelis that his equity in his home was sufficient to cover the $360,425 required to be preserved for disgorgement:

> The house that is indicated as item B in this order, located at 50–28 65th Street in Woodside New York is here, *it is in Mr. DeAngelis's possession*. It is worth approximately between 350 and 400,000. I believe it is a very small mortgage of eight or ten thousand left on it and—eight thousand, and that is very much available, it has not been transferred, *it is in Mr. DeAngelis's name, it is not encumbered other than to the amount*, and it seems to me that we can have an appraisal done, obviously, but it seems to me that it would more than cover the amount stated in this order.

Trial transcript at 311 (emphasis added). Two years later, after the Judgment was entered, in opposing the instant motion for contempt, DeAngelis stated:

> My property consists of a modest family home located in Woodside Queens.... I estimate that my equity in my home would

be worth approximately $100,000.00 (One Hundred Thousand Dollars) in a strong market. The value of my home in this depressed market diminishes the value of my equity.

Declaration of Albert J. DeAngelis in Opposition to Motion of Securities and Exchange Commission to Hold Defendant in Contempt of Court, dated February 13, 1991, at ¶ 4. What is significant—apart from the fact that his estimate of the value of his equity decreased far more than the conditions of the real estate market would appear to warrant—is as follows. As set forth above, in 1983 he offered his home as sufficient to satisfy any eventual order requiring disgorgement of profits, in 1989 he reiterated its availability, representing that "it is in [his] possession" and "it is in [his] name," and last year he continued to represent it as one of his assets, albeit at a greatly reduced value. In addition, at the initial hearing before me last year, DeAngelis began his testimony by answering the question posed by his lawyer of what action he took following entry of the Judgment:

Probably the next day or the day after or two days. Right then, I says, Settle it, I says. If you have to, I says, Look, I'll pay. I'll mortgage the house. I have the house. I didn't sell my house. I'll mortgage it and give it to them.

Transcript, October 8, 1991, at 3. At that hearing it was learned, however, that, contrary to his representations two years earlier, he was not the sole owner of the house but rather owned it jointly with his wife since its purchase about 30 years ago. He did, however, reiterate his intention to mortgage the house as his method of paying what he could of the Judgment (see, e.g., id. at 15). After that hearing, the SEC made a proposal of what amount DeAngelis should be ordered to pay based, in large part, upon the understandable assumption that DeAngelis would obtain a substantial amount of money by procuring a mortgage on the house. However, in DeAngelis's memorandum submitted in

response, DeAngelis balked. He argued that he should be required to pay no more than the $1,500 per month I had ordered as an interim measure and, for the first time, raised numerous reasons why obtaining a mortgage on the house (that he suddenly portrayed as some unreasonable, "improper" proposed idea dreamed up by the SEC (Answering Memorandum, dated October 22, 1991, p. 10)) would not be forthcoming. He thus contended, with no evidence whatsoever to support his arguments, inter alia, that no bank or other lending institution would give a mortgage for more than 50–70% of the amount of equity in any real estate; and that it was "merely speculation" as to whether he would be able to obtain a mortgage at all both because he might be deemed a bad credit risk, given the $615,918.82 Judgment against him herein, and because his wife would own half the interest in the house and could not be legally compelled to mortgage or sell her half-interest in the house. He also speculated that the value of the house had decreased even more. Id. at 10–11. Based on these unsubstantiated contentions, among others, he reasoned, apparently, that he should not be required even to apply for a mortgage, and he argued he was financially unable to pay more than the monthly $1,500.

It was after the foregoing submission that I told DeAngelis he had failed to meet his burden of showing his financial inability because all his arguments were speculation in the absence of evidence such as information from any lending institutions and an appraisal of the house. It was thereafter that he requested the hearing be reopened. Lo, at the resumed hearing, DeAngelis submitted a letter he had obtained from an officer of the bank which held the original mortgage on the house stating that the bank would not issue a mortgage on his half-interest in the property but required all owners of record to execute it, and he presented Mrs. DeAngelis's testimony that she would not consent to turning over her half-interest for a mortgage to the bank.[4]

4. Despite the fact that DeAngelis inquired about a mortgage between our first and second hearing and obtained the letter from the bank only because the SEC—and I—told him he would be

required to obtain a mortgage in view of all his prior representations, in his supplemental papers he now has the brashness to point to his inquiry to the bank as evidence of his diligence and

Finally, with respect to DeAngelis's purported good faith and diligence in attempting to meet his payment obligation, I note that it is also belied by the fact that, since entry of the Judgment, he has continued to live what is, in essence, a quite comfortable lifestyle with no apparent thought of cutting back to meet some of his obligation. If, indeed, he had been simply awaiting word from his attorney concerning payment, one would expect that he, at the least, would have been saving whatever money he could for when the day came. There is no reason he could not have shown his diligence by sending any small amounts into the Clerk of Court until the matter was resolved. To the contrary, the evidence shows that the DeAngelises drive two late-model luxury automobiles, maintain three videocassette recorders in their home, and house and feed an adult grandson who is fully capable of supporting himself. They own a fully-furnished condominium in Florida which is used solely as a vacation home for them and their children. DeAngelis's attitude is further evidenced by the fact that he frequents Atlantic City on a regular basis for the purpose of gambling where, according to his testimony, "the losses always exceed the gains." Transcript, October 8, 1991, at 53. He claims he goes to Atlantic City one or two days per month; his testimony is contradicted by his wife, however, who estimated he goes about six times per month. (*See* Transcript, October 8, 1991, at 65 and Transcript, January 23, 1992, at 45.)

## II.

While it is correct that a finding of civil contempt is not proper for the failure to pay a money judgment when the alleged contemnor is financially unable to make any pay-

ment, *see, e.g., Badgley v. Santacroce,* 800 F.2d 33, 37 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987); *Donovan v. Sovereign Sec., Ltd.,* 726 F.2d 55, 59 (2d Cir.1984), the burden of proving that compliance is impossible "plainly and unmistakably" rests with the contemnor, *see, e.g., In re Marc Rich & Co.,* 736 F.2d 864, 866 (2d Cir.1984); *Donovan v. Sovereign Sec., Ltd.,* 726 F.2d at 59, who must demonstrate it "categorically and in detail." *Glover v. Johnson,* 934 F.2d 703, 708 (6th Cir.1991); *Donovan v. Mazzola,* 716 F.2d 1226, 1240 (9th Cir.1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Aspira of New York, Inc. v. Bd. of Educ.,* 423 F.Supp. 647, 654 (S.D.N.Y.1976). DeAngelis has hardly satisfied that burden.

> This burden is satisfied by making "in good faith all reasonable efforts to comply." We construe this requirement strictly. "Even if the efforts he did make were 'substantial,' 'diligent' or 'in good faith,' ... the fact that he did not make 'all reasonable efforts' establishes that [respondent] did not sufficiently rebut the ... prima facie showing of contempt. The ... use of a 'some effort' standard for measuring the strength of [the] defense [would be] an abuse of discretion."

*Combs v. Ryan's Coal Co.,* 785 F.2d 970, 984 (11th Cir.), *cert. denied sub nom. Simmons v. Combs,* 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986) (citations omitted). DeAngelis, however, has "displayed an evident sense of nonurgency bordering on indifference," *Aspira of New York, Inc. v. Bd. of Educ.,* 423 F.Supp. at 654, and, in the face of evidence showing that he is able to make substantial payment, continues to claim financial inability.[5]

---

willingness to comply with the Judgment. *See* Memorandum in Opposition, dated August 21, 1992, pp. 6, 10. (Indeed, it is stated that "the record shows that the defendant took the trouble and incurred the expense of applying for a mortgage." *Id.,* p. 6. The record shows nothing more than that DeAngelis inquired about a mortgage. There has been no application or evidence of any expense whatsoever.) Moreover, it is extraordinary that this belated and rather questionable attempt to comply with his obligation he was forced to make by me should be referred to as his "t[aking] ... trouble."

**5.** To the extent DeAngelis has implied in this proceeding that an inability to pay the entire $615,918.82 at this time somehow absolves him from having been required to pay any portion of that sum, he cites no authority for such contention and it should be flatly rejected. *See, e.g., Donovan v. Sovereign Sec., Ltd.,* 726 F.2d at 59; *Piambino v. Bestline Products, Inc.,* 645 F.Supp. 1210, 1214 (S.D.Fla.1986).

The SEC's proposal of a lump sum payment of $100,000 and monthly payments of $2,000 can easily be met by DeAngelis in a number of ways. First, he can sell his interest in the Motel Montreal or transfer it to the SEC. The remaining principal due to him over the next five years is $86,665 and an additional amount in interest is at least $35,000, for a total of over $120,000 at a minimum. It should be noted that, although DeAngelis claimed that when he receives the checks on the motel payments he gives them to his wife and she deposits them in the bank and uses them for household expenses, Mrs. DeAngelis testified that she never sees that money:

Q. What happens to that money?

A. He keeps it.

Q. Do you know that he does with it?

A. I guess he buys stock. I don't know; that's my problem with him.

Q. He doesn't give it to you?

THE COURT: Does it go into the Citibank account?

THE WITNESS: When he gets the check he just cashes it after 7 days. I don't know what he does; that I have nothing to do with it. That's true. I don't even know.

Q. That has been happening every year since he sold it?

A. Yes.

Transcript, January 23, 1992, at 28–29. Insofar as it is quite clear that Mrs. DeAngelis

pays *all* household expenses out of the Citibank account and the Social Security checks, one can only speculate as to the uses to which DeAngelis has been putting the Motel Montreal payments.[6]

Second, the condominium in Florida can be sold or rented. It sits vacant but for a few weeks a year when Mrs. DeAngelis and/or her children vacation there. DeAngelis's son-in-law estimates its worth to be at least $135,000. Moreover, if it were sold, a minimum of $5,400 now spent annually for its maintenance, taxes and utilities would be additionally available, and, if rented, presumably these expenses would be covered and some income made as well. A third possibility is that Mrs. DeAngelis sell the jewelry store she owns, DeAngelis Jewelers, to her daughter and son-in-law now instead of in the future.[7] Its value is estimated at $70,000. At the very minimum, they could take some of the income out of it to apply to household expenses.[8] It is worth noting that DeAngelis used substantial funds "borrowed" from DeAngelis Jewelers to finance his illegal trading. *See SEC v. Musella*, 748 F.Supp. at 1033, 1039. Fourth, they could rent out the fully equipped second-family apartment in their house that is currently being occupied by their grandson or they could require him to pay a fair market rental for it.[9] Fifth, they can generally cut down on their lifestyle in any number of ways, such as no longer lavishing gifts on their grandchildren for a while,[10] getting rid of the second unnecessary telephone in their house and

6. I am not the first in this courthouse to question DeAngelis's credibility. The lack thereof has already been found by both you and Judge Haight. You specifically found his testimony "not believable and ... inconsistent with the facts," "not credible and ... contrary to the facts," and "beyond credulity." *SEC v. Musella*, 748 F.Supp. 1028, 1039 (S.D.N.Y.1989), *aff'd*, 898 F.2d 138 (2d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 57, 112 L.Ed.2d 32 (1990). You found that "he manufactured his explanations." *Id.* at 1040. Similarly, Judge Haight six years earlier found DeAngelis "inherently incredible" and demonstrating "an intent to accomplish by duplicity what his counsel was unable to accomplish by way of legal argument." *SEC v. Musella*, No. 83 Civ. 342 (CSH), 1984 Fed.Sec.L.Rep. (CCH) ¶ 91,647 at p. 99,284 (S.D.N.Y. Sept. 4, 1984).

7. Her son-in-law testified he expects his wife to buy the store or receive it as a gift or inheritance

from Mrs. DeAngelis at some time in the future. Transcript, January 23, 1992, at 89.

8. While it is true that Mrs. DeAngelis cannot be compelled to sell her property to satisfy her husband's debt, it is also the case that, given her ample access to monies from her own assets, there is no reason that he should be allowed to fully support her and claim no monies are therefore available simply because she is "unwilling" to use her assets to pay his Judgment.

9. Mrs. DeAngelis testified she buys groceries almost daily and spent $76 in one day just before the hearing because her grandson "eats me out of house and home; he is always eating...." Transcript, January 23, 1992, at 42.

10. Mrs. DeAngelis testified, "My first five, I buy them clothes, buy them what they need, under-

driving less expensive automobiles that will also be less expensive to maintain. It may be noted, in any event, that the loan on one of the cars for which they pay $384 monthly will be fully paid off in less than a year.[11] In addition, the small remaining mortgage on the house, currently costing $435 per month, should be fully paid within about two years, ending that monthly expense.[12] And, beyond doubt, DeAngelis can cease his frequent trips to Atlantic City where he gambles and loses money that is owed to investors and the government.[13]

DeAngelis apparently believes that he is entitled simply to continue living in the style to which he has accustomed himself and, if so doing consumes all his current income, that he is absolved of paying his debt because he is rendered financially unable to do so. This view of the law cannot be condoned. Needless to say, his obligation to this Court's Judgment must be met even if it would require some real sacrifice. As shown above,

however, to meet the SEC's current payment proposal, no real sacrifice is even necessary. Any number of combinations of the methods suggested above would more than meet that proposal without requiring all of them.[14] DeAngelis seems to have lost sight of the fact that he has been found to have broken the law and harmed innocent investors by engaging in insider trading. Your Honor's Judgment requiring disgorgement is not to be treated as a contribution to one's favorite charity that one makes if and when one feels able to do so. The SEC's disgorgement program is important, because, as your Honor noted, "By prohibiting insider traders from profiting from their wrong-doing, disgorgement facilitates enforcement of the federal securities laws." *SEC v. Musella*, 748 F.Supp. at 1042.

## CONCLUSION

For all of the foregoing reasons, the SEC's motion should be granted and DeAngelis

---

wear, socks, all those things, shirts. The big ones, I just buy little gifts and I give them money," and "[e]ach big one gets $200 every Christmas." Transcript, January 23, 1992, at 31.

**11.** One also wonders why a second car, a 1990 Lincoln Town Car that Mrs. DeAngelis uses to go to their nearby grandchildren's homes, is necessary at all. *See* Transcript, October 8, 1991, at 20.

**12.** It is curious, but consistent with the pattern of DeAngelis's representations to the court over the last nine years, that during trial before your Honor in March 1989 he claimed there was only "eight or ten thousand left ... eight thousand" on the mortgage (*see* p. 607, *supra*) and close to three years later he claims there is still about $10,000 remaining.

**13.** DeAngelis contends that "[i]n determining the extent to which property or assets should be applied to satisfy the subject judgment, it is submitted that the Court should determine to what extent an enforcement judgment of a similar state agency would be enforceable in the Courts of the State of New York," Memorandum in Opposition, dated August 21, 1992, p. 11, and then goes on to state that neither DeAngelis's pension nor his Social Security retirement benefits are subject to attachment or execution to satisfy judgments under state law. But this argument shows DeAngelis misses the point. Our concern here is simply whether the assets and property DeAngelis enjoys allow him to make payments on this Court's Judgment or whether, as he claims in an effort to avoid his contempt,

he has virtually nothing remaining after payment of necessary living expenses.

**14.** Moreover, there is reason to believe DeAngelis may have access to more funds than he has revealed, because some questions have not been adequately resolved. For example, his tax returns show substantial proceeds from the sales of securities in 1988 and 1989. DeAngelis could not explain what happened to that money and professed not to even remember owning the stocks. Transcript, October 8, 1991, at 29–30. (This testimony brings to mind Judge Haight's finding that DeAngelis's assertions in the matter then pending before him suggested "an incipient senility at odds with defendant's apparent business acumen and shrewd demeanor." *SEC v. Musella*, 1984 Fed.Sec.L.Rep. (CCH) ¶ 91,647 at p. 99,284.) He then opined that the transactions could have been his wife's in her own brokerage account. Transcript, October 8, 1991, at 30. But Mrs. DeAngelis testified she had "nothing to do with that," never had any securities transactions in 1988, and that "[t]hat must be his." *Id.* at 25–26. And the DeAngelises' son-in-law testified that to his knowledge Mrs. DeAngelis has not had a brokerage account for many years. Transcript, January 23, 1992, at 92.

Furthermore, additional sums of money from miscellaneous sources, not listed in the schedule of assets or discussed above, appear to be available. For example, Mrs. DeAngelis has a bank account in Florida containing $6,000 that she received from her father, *see* Transcript, January 23, 1992, at 24–25, and the DeAngelises appear to receive gifts from people in the form of cash, *see id.* at 71.

found in contempt of this Court's Final Judgment and Order of September 28, 1989. To purge his contempt, the following should be required.

First, DeAngelis shall pay to the Clerk of Court $100,000 within ninety (90) days from the date your Honor will be entering an order. In the alternative, he may transfer to the SEC within ten (10) days his entire right to principal and interest on the Motel Montreal mortgage note he owns.

Second, he shall pay to the Clerk of Court $2,000 at the end of each month commencing with the month in which your Honor's order will be entered. These payments shall continue until further order of the Court.

Third, he shall be enjoined from disposing of or encumbering in any way his interest in his home without further order of the Court.[15]

Finally, DeAngelis shall provide a financial statement to the Court, with a copy to the SEC, every six months, under oath, showing household income and expenses and shall also provide his yearly tax returns. As DeAngelis's disgorgement obligation is a continuing one, either party shall retain the right to apply to the Court for modifications of the payment requirements in the event of changing financial circumstances.[16]

Copies of this Report and Recommendation have been mailed October 29, 1992 to the following:

William H. Kuehnle, Esq.
United States Securities &
Exchange Commission
450 5th Street, N.W.—Mail Stop 4–2
Washington, D.C. 20549
Jonathan C. Scott, Esq.
51 Normandy Drive
Northport, New York 11768

The parties are hereby directed that if you have any objections to this Report and Recommendation you must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court and send copies to the Honorable Kimba M. Wood, to the opposing party and to the undersigned. Failure to file objections within ten (10) days will preclude later appellate review of any order that will be entered by Judge Wood. *See* 28 U.S.C. § 636(b)(1); Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure; *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.1992); *Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir.1989) (per curiam); *Wesolek v. Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir.1983) (per curiam).

Dated:  New York, New York

October 29, 1992

---

**15.** The court-appointed appraiser values the property at $210,000, and there is reason to believe that this valuation is low. An injunction preventing its disposition is appropriate for a number of reasons. If his wife predeceases him, DeAngelis will become sole owner of the property and it will become available, as previously falsely represented, to secure funds. If he and his wife decide to sell it, proceeds he earns from its sale may be available. In any event, although DeAngelis objects to such an injunction, there would appear to be no valid reason not to enter one. The Court will always be here to consider modifying the prohibition with respect to any plans for the property he may wish to undertake.

**16.** It should be mentioned that DeAngelis claims in his memorandum submitted in August that he has been unable to pay his federal and state income taxes of about $17,000 because of the $1,500 per month he has been paying pursuant to my interim order. He asks that "judicial notice ... be taken of these tax liabilities." Memorandum in Opposition, dated August 21, 1992, p. 4. I recommend that your Honor take no cognizance of these liabilities. Although he attaches the tax deficiency notices he has received, there has been no evidence presented as to why he has seen fit not to pay his taxes at this time, and, as detailed above, there are more than adequate funds available for him to meet his tax obligations as well as his obligations to your Honor's Judgment.