UNITED STATES of America,
Plaintiff–Appellee,

v.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WARE-HOUSEMEN AND HELPERS OF AMERICA, AFL–CIO, et al., Defendants.

Appeal of Daniel LIGUROTIS,
Defendant–Appellant.

No. 951, Docket 89–6286.

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1990.

Decided March 8, 1990.

Jordan S. Stanzler (Tracy E. Makow, Anderson, Kill, Olick & Oshinsky, Stuart E. Abrams, David S. Hammer, Mayer, Brown & Platt, New York City, on the brief) for defendant-appellant.

Edward T. Ferguson, III, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty. for the S.D.N.Y., Richard W. Mark, Asst. U.S. Atty., on the brief), for plaintiff-appellee.

Before OAKES, Chief Judge, and KEARSE and FLETCHER,* Circuit Judges.

FLETCHER, Circuit Judge:

## FACTS

On June 28, 1988 the United States filed a civil complaint against the International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America, AFL–CIO (the IBT), the General Executive Board of the IBT (the GEB), individual members of the GEB including appellant Daniel Ligurotis, and various individuals alleged to engage in organized crime. The complaint charged the defendants with violations of the RICO Act, 18 U.S.C. § 1964.

On March 14, 1989, the eve of the scheduled trial, the IBT, the members of the GEB, and the government agreed to a Consent Order. District Judge David N. Edelstein approved the order. Daniel Ligurotis, among others, signed it.

The Consent Order amends the IBT constitution and sets forth the procedures for the 1991 election of IBT officers. The election takes place in three stages: first, at the local union level, the election of del-

---

* Hon. Betty B. Fletcher, United States Circuit Judge for the Ninth Circuit, sitting by designa-

tion.

egates to the international convention; second, at the convention itself, the election of nominees by the delegates; and third, across the international union's entire territory, the one-member, one-vote election of the officers from among the nominees selected at the convention. These procedures differ dramatically from those specified in the old IBT constitution.

The Consent Order gives power to three court-appointed officers to oversee certain aspects of the affairs of the IBT: an Investigations Officer, an Election Officer, and an Independent Administrator. The Investigations Officer is to investigate corruption and prosecute charges against alleged offenders. The Election Officer is to "supervise" the 1991 election of IBT officers. The Administrator is to oversee the actions of the other two officers and to resolve disputes arising from their activities. The Administrator may make "any application to the Court that the Administrator deems warranted" in order to have the court interpret the Consent Order and facilitate its implementation. The other parties to the Order may make applications as well.

The Consent Order provides *inter alia,* "This Court [the District Court for the Southern District of New York] shall have exclusive jurisdiction to decide any and all issues relating to the Administrator's actions or authority pursuant to this order." The Order further provides that "[d]efendants ... Daniel Ligurotis [and others] are hereby permanently enjoined from ... obstructing or otherwise interfering with the work of the court-appointed officers[.]"

Within a few months of the signing of the Order, a dispute arose between the Election Officer and the GEB. The GEB indicated that it read the Election Officer's power to "supervise" the 1991 election of IBT officers narrowly to include only the nominations at the convention and the subsequent unionwide election from among the nominees. The Election Officer believed he had the power to make rules governing all stages of the election, including the elec-

tions at the local union level of delegates to the IBT convention.

The Independent Administrator made an application to the court on September 29, 1989 to determine the scope of the Election Officer's authority. On October 18, the court issued a memorandum holding that the Election Officer had broad power to supervise the entire election process and to institute meaningful electoral reforms.

Daniel Ligurotis is both a member of the international's General Executive Board and the principal officer of Chicago Local 705 of the IBT.[1] At a meeting of Local 705 that took place the day after the district court entered its October 18 memorandum, Ligurotis told the members that he had recently talked to IBT General President William McCarthy. He said, "I told McCarthy I'm not going along with this shit. Nobody's going to come up and tell me how to run my locals." He said he intended to file a lawsuit to prevent the Election Officer from supervising local elections.

On November 16, at the next membership meeting of Local 705, Ligurotis said he would file a lawsuit in Chicago to "undermine the Government's position" in New York before Judge Edelstein.

On November 17, a lawsuit was filed in the United States District Court for the Northern District of Illinois. The Chicago lawsuit named Election Officer Michael H. Holland as defendant. The plaintiffs were five local unions (Locals 705, 301, 726, 734 and 781) and the respective officers of those locals, including Daniel Ligurotis. The Chicago action contended among other things that the Consent Order infringed the rights of local unions in a proceeding to which they were not parties, thereby violating due process and the federal labor laws.

On November 22, the government moved in the New York district court for an order pursuant to the All Writs Act, 28 U.S.C. § 1651, restraining the Chicago plaintiffs from proceeding with their suit, and hold-

---

**1.** Ligurotis has positions at every level of the IBT hierarchy. In addition to his positions at the local and international level, he is President of the IBT Joint Council 25 in Chicago, to which the Chicago locals belong. He is also International Director and Chairman of the Policy Committee of the Central Conference of Teamsters, a midwest regional body.

ing Ligurotis in civil contempt for being a plaintiff in the Chicago suit. The government argued that by suing the Election Officer, Ligurotis was violating the provision of the Consent Order permanently enjoining him from "obstructing or otherwise interfering with the work of the court-appointed officers." The government also pointed out that the Consent Order provided for exclusive jurisdiction to decide "all issues relating to the Administrator's actions or authority" in the New York district court.

On November 27, the court enjoined all of the plaintiffs' activities in the Chicago suit, except for the filing of responsive motions.

On November 29, Ligurotis responded to the contempt motion by withdrawing from the Chicago action. An amended complaint was filed in Chicago deleting Ligurotis as a plaintiff.

The government then took the position that Ligurotis' contempt lay not only in his having been a plaintiff in the Chicago lawsuit, but also in his allowing the suit to continue. It argued that Ligurotis had the power to order the dismissal of the entire Chicago lawsuit. As evidence, it submitted Article 13 of the Bylaws of the Central Conference of Teamsters, of which Ligurotis is the Chairman of the Policy Committee. Article 13 is set out in relevant part in the discussion below.

After a hearing, the district court entered an order on December 12 finding Daniel Ligurotis in civil contempt both for filing the Chicago suit and for permitting it to continue. 726 F.Supp. 943. As a sanction, the court ordered Ligurotis to pay the government's expenses and fees for prosecuting the contempt action and the court-appointed officers' expenses and fees for defending the Chicago action—expenses and fees totaling $44,901.72. It ordered further that if Ligurotis did not arrange for the withdrawal of the Chicago action *with prejudice* within two days, he would have to pay a fine for every day the action continued. The fine would begin at $125 and double every day until it reached $512,-000.

Ligurotis appealed the order. This court granted a stay pending the disposition of the appeal.

## DISCUSSION

### A.

■ A federal court may punish contempt of a lawful order, whether the order issues directly from the court or from a consent decree agreed to by the parties. *United States v. City of Yonkers*, 856 F.2d 444, 450 (2d Cir.1988), *rev'd in part on other grounds sub nom Spallone v. United States*, ─ U.S. ─, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990). In this case, the district court found that Ligurotis had violated the provision of the Consent Order prohibiting him from "interfering with the work of the court-appointed officers."

■ Holding a person in contempt for violating an order is justified only when the order is "clear and unambiguous." *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989). An unclear order provides insufficient notice to justify a sanction as harsh as contempt.

■ The Consent Order's specific injunction against Ligurotis' "interfering with the work of the court-appointed officers" coupled with its provision for exclusive jurisdiction in the New York district court, clearly and unambiguously prohibits purposeful interference of the kind caused by Ligurotis' participation in the Chicago lawsuit as a named plaintiff. When Ligurotis announced his intention to file the lawsuit, he made clear that his purpose was to "undermine" the New York court's recent interpretation of the Consent Order regarding the powers of the Election Officer—an interpretation for which the government and the Administrator had argued. He explicitly stated that he was "not going along" with the New York court's decision, even though he was a party to it.

While litigation against a person does not always amount to "interference" with his work, in this case there is clear and convincing evidence that Ligurotis instigated the bringing of the suit purposefully to

harass the Election Officer by forcing him to relitigate some issues already decided adversely to Ligurotis.[2] The district court thus did not abuse its discretion in holding Ligurotis in contempt for being a party to the Chicago lawsuit. See *Meyerson v. Werner*, 683 F.2d 723, 728 (2d Cir.1982) (per curiam) (defendant's filing a sham bankruptcy petition was a "vexatious and contemptuous effort to violate the district court's prior orders" and was thus remediable by contempt sanctions).

### B.

The district court did more than simply hold Ligurotis in contempt for filing the Chicago action; it went further and held him in contempt for allowing the other plaintiffs to pursue the action after he withdrew from the suit. The other plaintiffs in the Chicago suit argued to the Chicago court that they were not parties to the Consent Order and thus could not be bound by its provisions. Notwithstanding their position, Judge Edelstein required Ligurotis to have the Chicago suit dismissed *with prejudice* as a condition of purging himself of contempt. A dismissal with prejudice would mean that the claims raised in the Chicago court could never again be raised in any court.

At the time the district court issued its contempt order, it had made no finding that the Chicago plaintiffs were parties to the Consent Order—let alone that they were among those whom the Consent Order permanently enjoined from interfering with the work of the court-appointed officers. Nor did the court find that any of the Chicago plaintiffs were agents, puppets, or alter egos of Ligurotis. Yet it issued an order to Ligurotis that, if obeyed, had the potential to prejudice their rights.

■ Ligurotis argues that the court cannot, as a condition to purging himself of contempt, coerce him to order persons whose actions he may not rightfully control to forfeit their substantial legal rights. We agree.[3] Were the law otherwise, one of two results could follow. A third person might assert his right not to accede, and the contemnor, in order to avoid contempt sanctions, would then have to exercise unlawful authority to satisfy the conditions imposed by the contempt order. Or a third person might, in order to spare the contemnor the heavy burden of contempt penalties, accede to the contemnor's demand even though he was not legally obliged to accede. Neither result is tolerable. A contempt order should not use the contemnor as a "hostage" to put pressure on third parties interested in his release from contempt. See *Newman v. Graddick*, 740 F.2d 1513, 1528 (11th Cir.1984) (defendant state Attorney General could not be held in contempt for failing to "prompt the Governor, the Legislature or the Parole Board" to remedy violations of court order when the Attorney General had no legal right to control the actions of those officials). Nor should a contempt order require the contemnor to overstep his lawful authority. See *New York State Ass'n for Retarded Children v. Carey*, 631 F.2d 162, 166 (2d Cir.1980).

■■ The government argues that Ligurotis has the power to order the withdrawal of the Chicago lawsuit. This may

---

**2.** Ligurotis argues strenuously that filing a lawsuit cannot amount to "obstruction" of the work of the court-appointed officers. We need not decide that question because the Consent Order prohibits not just "obstruction" but also "interference," a word with somewhat less harsh connotations. The district court rested its contempt finding on Ligurotis' "interference."

**3.** In finding that the contempt order jeopardized the local unions' "substantial legal rights," we in no way intimate any view as to the ultimate merits of the local unions' claims. Nor do we decide the question whether the local unions are bound by the Consent Order. We simply hold

that during the time that Ligurotis has been under the contempt order, the local unions have pressed non-frivolous legal claims concerning the application of the Consent Order to them. The government does not dispute this. Judge Edelstein filed a sixty-two page memorandum on January 17, 1990 addressing the claims of over three hundred locals—claims similar to those raised in the Chicago action. We express no view as to the correctness of the January 17 memorandum. We do note, however, that its very length and complexity gives the lie to any argument that the local unions' claims are frivolous.

be true; he may have the raw power. But the government must show that Ligurotis has the lawful authority to withdraw the suit.[4] *Id.* The government offers a great deal of evidence concerning Ligurotis' general influence in the Teamsters, but it does not offer persuasive evidence that the lawful scope of his power extends to ordering the withdrawal of the Chicago lawsuit. The only evidence the government points to in its brief to prove that Ligurotis has the remarkable right to order single-handedly the dismissal with prejudice of lawsuits brought by locals is Article 13 of the Bylaws of the Central Conference of the IBT.

Headed "Legal Department," Article 13 states in its first paragraph that the legal department is to coordinate the legal activities of local unions to the extent they have an effect on other locals or on the Conference as a whole. Local unions are to inform the Conference's legal department of any litigation so that it may be coordinated effectively. The final sentence of the second paragraph provides that the Chairman of the Policy Committee (Ligurotis) "is authorized to instruct the Legal Department to supervise the conduct of any litigation which may affect the Conference as a whole, or other Local Unions affiliated with the Conference, and to determine whether litigation shall be continued or abandoned, or if appeals in particular cases, where adverse precedents might be established, shall then be taken."

The government argues, and the district court agreed, that the right "to supervise ..." belongs to the legal department but that the right "to determine ..." belongs to the Chairman, so that the Chairman has the power to determine whether litigation shall be abandoned.[5] Ligurotis argues that Article 13 does not confer policy-making power on the Chairman but rather that the article merely specifies that the Chairman is the person who is to request the legal department's advice on legal questions of concern to the Conference.

We agree with Ligurotis. Article 13 does not grant policymaking power at all. Rather, Article 4, headed "Policy Committee Duties and Powers," grants such power. Article 4 vests broad power in the Policy Committee to "make policies ... appropriate to the attainment of the objects" of the Conference and "[t]o take such action as in its judgment will further the best interests of the Conference and its members." Determining whether litigation will be pursued to obtain a particular objective is a paradigmatic example of the exercise of a policy-making power. Thus, read in the context of the complete Central Conference Bylaws, Article 13 does not confer on the Chairman the power to control litigation. It simply establishes a procedure according to which the Chairman can ask the legal department to review and analyze the legal positions taken by the various locals with an eye toward devising a litigation strategy in the best interests of the Conference as a whole.

If Ligurotis had the authority to order the dismissal of lawsuits brought by locals, it would be pursuant to Article 4, not Article 13. Article 4 confers general authority on the Chairman of the Policy Committee to act on behalf of the Committee between meetings and to take action "which in his judgment are *in the best interest of the Conference and its affiliates.*" (Emphasis added.) As the italicized clause makes clear, the Central Conference Bylaws do not give the Chairman the right to order a suit to be dropped simply because he deems it in *his* narrow interest to drop the suit. If the Chicago locals had filed suits against Ligurotis for example for mismanaging the funds he controlled in one or more of his

---

**4.** In cases where the contemnor claims that it is factually impossible for him to comply, he must bear the burden of producing evidence to support his claim. *See United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 1552, 75 L.Ed.2d 521 (1983). But in a case such as this where the facts are not disputed and the question is the contemnor's legal authority to com-

ply, there is no need to allocate evidentiary burdens, since the question is one of law.

**5.** We review *de novo* the district court's interpretation of the language of a document such as a contract or a bylaw. *See Kern Oil & Refining Co. v. Tenneco Oil Co.,* 840 F.2d 730, 736 (9th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988).

various positions, and Ligurotis then attempted to dismiss the suits relying on the Central Conference Bylaws as the source of his authority, we doubt the government would concede his authority. Such an exercise of Ligurotis' "authority" would not be rightful since it would not be undertaken to further the interests of the Conference as a whole.

The government has not attempted to argue that the dismissal of the Chicago lawsuit with prejudice would be in the best interests either of the locals or of the Conference.[6]

Since the order against Ligurotis holding him in contempt until the Chicago lawsuit is withdrawn with prejudice either could cause the locals, non-parties to the contempt order, to yield to its conditions, or alternatively could cause Ligurotis to act beyond his authority,[7] we find the district court's order to be an abuse of discretion. *See Newman; New York State Ass'n for Retarded Children.* Ligurotis cannot be required to surrender the rights of other parties.

Once Ligurotis himself withdrew from the Chicago action on November 29, 1989, he had done all he rightfully could to purge himself of contempt.

### C.

██ Contempt sanctions may serve either or both of two purposes: "to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *Terry,* 886 F.2d at 1352. Because Ligurotis had purged himself by November 29, the government and officers are entitled only to fees and expenses incurred between November 17, 1989, the date of the filing of the Chicago lawsuit and November 29,

1989. We vacate the current award of fees and expenses, but remand for a modified award based on an allocation of the fees and expenses to the Election Officer, the Independent Administrator, and the United States attributable to the period November 17 to November 29.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.

---

6. We note that just as the fines against the Yonkers city council members in *Spallone* were likely to have the effect of forcing them to vote their own interests rather than the city's, *Spallone,* 110 S.Ct. at 634, the potential $512,000 fine against Ligurotis personally would likely have caused Ligurotis to further his own interest in avoiding the fine and not the interests of the

Conference as a whole in pursuing potentially meritorious litigation.

7. Ligurotis is, of course, an officer of Local 705, but Local 705's bylaws give the Local Union Executive Board—not just one member—the power to control litigation. The government has presented no evidence that Local 705 or its Board is a mere tool of Ligurotis.