06-2432-cv
Chao v. Gotham Registry

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued March 1, 2007          Decided January 24, 2008)

Docket No. 06-2432-cv

_____

Elaine L. Chao, Secretary of Labor,

Plaintiff-Appellant,

v.

Gotham Registry, Inc., Gotham Per Diem, Inc.,

Defendants-Appellees.

_____

Before:

JACOBS, Chief Judge,
CARDAMONE, and SOTOMAYOR, Circuit Judges.

_____

Plaintiff Elaine L. Chao, Secretary of Labor, appeals from an order dated March 20, 2006 of the United States District Court for the Southern District of New York (Stanton, J.) denying her petition for adjudication of civil contempt against defendant Gotham Registry, Inc., and its president, Caroline Barrett.

Affirmed.

Chief Judge Jacobs concurs in a separate opinion.

_____

_____

MARIA VAN BUREN, Washington, D.C. (Howard M. Radzely, Solicitor of Labor, Steven J. Mandel, Associate Solicitor, Paul L. Frieden, U.S. Department of Labor, Office of the Solicitor, Washington, D.C., of counsel), for Plaintiff-Appellant.

STEVEN KAPUSTIN, Blue Bell, Pennsylvania (Barry A. Furman, Kaplin, Stewart, Meloff, Reiter & Stein, P.C., Blue Bell, Pennsylvania, of counsel), for Defendant-Appellee.

_____

CARDAMONE, Circuit Judge:

In 1937 America was in the depths of a depression and employment was scarce. President Franklin Roosevelt introduced a measure to address this problem in a bill that became the Fair Labor Standards Act. The bill aimed to raise the pay of the underpaid and reduce the hours of the overworked or, as stated in the Presidential message accompanying the proposed legislation, to obtain "a fair day's pay for a fair day's work." 81 Cong. Rec. 4983 (1937) (message of President Roosevelt). Today, things are different, particularly in the nursing profession where there are not enough nurses to meet the demand for their services. This shortage and the frequent resort to overtime to compensate for it precipitated the instant action.

The litigation before us was initiated in 1992 in the United States District Court for the Southern District of New York before Judge Louis L. Stanton by the Secretary of Labor against defendants Gotham Registry, Inc. and its affiliate Gotham Per Diem, Inc. Suit was brought under the provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (FLSA or Act), and resulted on June 6, 1994 in a consent judgment against Gotham, requiring it to pay its nurses time and one-half wages for overtime in compliance with the Act. On December 29, 2004 plaintiff Elaine L. Chao, the current Secretary of Labor (Secretary or plaintiff), filed a petition for adjudication of civil contempt against Gotham Registry, Inc. and its president, Caroline Barrett (collectively, Gotham, employer or staffing

2

agency), for their alleged failure to abide by the terms of the consent judgment. The Secretary sought an order requiring Gotham to pay back wages plus interest from January 1, 1999 through the present. On January 19, 2005 Gotham filed a response and counterclaim to the petition denying any violation of the consent decree and requesting the district court to vacate the decree's injunctive provision because of changed circumstances.

Judge Stanton, who had maintained jurisdiction over this matter since its inception, conducted an evidentiary hearing on March 20, 2006. At the close of plaintiff's case, Gotham moved for judgment in its favor pursuant to Fed. R. Civ. P. 52(c). Judge Stanton granted that motion from the bench and held Gotham not in contempt of the consent judgment. In an order entered March 23, 2006 the district court denied the Secretary's petition. From this order the Secretary appeals.

BACKGROUND

We turn to the facts. A typical Gotham placement begins when one of its client hospitals requests a nurse to fill a temporary vacancy or to support hospital personnel during a peak period. Gotham then offers the assignment to a nurse on its register, and the nurse who accepts the position reports directly to the hospital. The nurse is required to sign in and out on daily time sheets, which are compiled and reviewed by the hospital and forwarded to Gotham each week. Gotham is not permitted to go on hospital premises to verify the nurse's hours

3

or otherwise supervise his or her performance. The hospital pays Gotham an hourly fee multiplied by the number of hours worked by the nurse and Gotham pays most of this money to the nurse.

Until the early 1990s, Gotham did not pay its nurses overtime wages for hours worked in excess of 40 hours in any workweek because it viewed the nurses as independent contractors. After the Department of Labor commenced an enforcement action in 1992 against the staffing agency asserting that its practice of paying nurses straight-time wages for overtime hours violated the Act, Gotham consented to treat the nurses on its register as employees for purposes of the Act. Specifically, the 1994 consent judgment included a prospective injunction requiring Gotham to comply with 29 U.S.C. § 207(a) by paying its nurses time and one-half wages for time worked over 40 hours in any week.

As Gotham's clients do not pay Gotham a premium for overtime hours in all cases, Gotham's promise to abide by the Act quickly proved expensive. After seeking advice of counsel, the staffing agency adopted a policy designed to check unauthorized overtime or, failing that, insulate itself from claims for time and one-half compensation for unauthorized hours. Gotham's overtime policy is printed on the time sheets completed by its nurses and reads: "You must notify GOTHAM in advance and receive authorization from GOTHAM for any shift or partial shift that will bring your total hours to more than 40

4

hours in any given week. If you fail to do so you will not be paid overtime rates for those hours."

In the course of their assignments at client hospitals, Gotham nurses are sometimes asked to work overtime by hospital staff. Nurses who agree to work an unscheduled shift will on occasion contact Gotham first to request approval in compliance with Gotham's rule. If Gotham authorizes an assignment, the nurse is guaranteed premium wages for any resulting overtime. But three out of four approval requests are denied. At other times, nurses accept unscheduled shifts without obtaining the staffing agency's approval. When these nurses report their overtime for the preceding week, Gotham attempts to negotiate with the hospital to procure an enhanced fee for the overtime hours already worked. If Gotham succeeds -- as it does ten percent of the time -- it pays the nurse time and one-half wages for the unauthorized overtime hours. Otherwise, the nurse receives straight-time wages for the extra hours worked.

It is this scenario that gives rise to the Secretary's contention that Gotham's overtime practices violate 29 U.S.C. § 207(a) and, by extension, the 1994 consent judgment. The plaintiff's petition seeks back wages in excess of $100,000 plus pre-judgment interest for the period from January 1999 through June 2002 and calls for an accounting of Gotham's wage obligations from 2002 to the present. After a one-day trial in March 2006, Judge Stanton granted Gotham's motion for judgment based on partial findings at the conclusion of the Secretary's

5

case. He denied the Secretary's petition to hold defendants in contempt. The district court also denied the Secretary's claim concerning record-keeping violations and Gotham's counterclaim to dissolve the injunction, but neither of these latter two rulings have been appealed.

The Secretary challenges that portion of the district court's March 20, 2006 judgment that denies her petition for civil contempt against Gotham. That court believed the unauthorized hours did not constitute work under the Act or, if these were working hours, the legal question was too much in doubt to warrant civil contempt. On this appeal the Secretary presents us with two questions: first, whether Gotham's overtime practices violate the Act; and second, if so, whether the violation provides an adequate basis for civil contempt.

We think the trial court erred in labeling the nurses' overtime hours as anything other than work and answer the first question in the affirmative. But because we believe Gotham acted on a reasonable interpretation of then unsettled law, we answer the second question in the negative, and affirm the district court's judgment on the alternative ground that the Secretary did not meet her burden to prove contempt.

DISCUSSION

I   Standard of Review

We review the denial of a petition for civil contempt under the abuse of discretion standard. <u>Dunn v. N.Y. State Dep't of Labor</u>, 47 F.3d 485, 490 (2d Cir. 1995). While we uphold the

6

district court's factual findings unless they are clearly erroneous, the ultimate legal question of whether an employee is entitled to overtime pay under the FLSA is subject to plenary review. See Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 743 (1981); Holzapfel v. Town of Newburgh, 145 F.3d 516, 521 (2d Cir. 1998). Further, where a party challenges a principle of law relied on by the district court in making a discretionary determination, we review de novo its choice and interpretation of such principles. Scalisi v. Fund Asset Mgmt., 380 F.3d 133, 137 (2d Cir. 2004).

II  Violation of the Act's Overtime Provisions

Our first question is whether Gotham's failure to pay time and one-half wages to its nurses for unauthorized overtime violated the Act's overtime provisions. The Act provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

"Employ" is defined in the Act as including "to suffer or permit to work," 29 U.S.C. § 203(g), but Congress did not define the word "work." See IBP, Inc. v. Alvarez, 546 U.S. 21, 25 (2005). The broad meaning that has emerged from Supreme Court cases describes work as exertion or loss of an employee's time that is (1) controlled or required by an employer, (2) pursued necessarily and primarily for the employer's benefit, and (3) if

7

performed outside the scheduled work time, an integral and indispensable part of the employee's principal activities. Holzapfel, 145 F.3d at 522; see Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944); see also Armour & Co. v. Wantock, 323 U.S. 126, 133 (1944) (clarifying that exertion is not required to satisfy definition of work); Steiner v. Mitchell, 350 U.S. 247, 252-53 (1956) (addressing exertion outside of scheduled working time).

The Supreme Court has explained that the Act's overtime provisions were aimed not only at raising wages but also at limiting hours. Overnight Motor Transp. Co. v. Missel, 316 U.S. 572, 576-78 (1942). In other words, these provisions were designed to remedy the "evil of overwork" by ensuring workers were adequately compensated for long hours, as well as by applying financial pressure on employers to reduce overtime. Id. at 577-78; see also United States v. Rosenwasser, 323 U.S. 360, 361 (1944). In service of the statute's remedial and humanitarian goals, the Supreme Court consistently has interpreted the Act liberally and afforded its protections exceptionally broad coverage. See, e.g., Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296 (1985); Rosenwasser, 323 U.S. at 362, 363 & n.3; Tenn. Coal, 321 U.S. at 597 ("Such a statute must not be interpreted or applied in a narrow, grudging manner.").

A. The Unauthorized Overtime Is Work

8

Gotham argues it neither benefits from nor controls the nurses' unauthorized overtime and, accordingly, such time does not constitute work under the Tennessee Coal test (as extended in subsequent cases and elaborated in Holzapfel). Tenn. Coal, 321 U.S. at 598; Holzapfel, 145 F.3d at 522. Gotham seeks support for this proposition in the trial court's findings that (1) Gotham lacks primary control over the nurses' performance of unscheduled shifts; (2) the decision to engage in overtime is made by nurses and hospitals acting in furtherance of their own interests; (3) the income generated by these unauthorized hours is offset by the administrative burdens of operating Gotham's overtime arrangement; and (4) Gotham does not desire the overtime to be performed. Although we detect no clear error in these factual findings, the legal conclusion drawn from them -- that the nurses' overtime is not work under the Act -- we think is wrong.

Whether a nurse is working a morning, afternoon or night shift in emergency care, an operating room, or on a hospital floor, the overtime hours are indistinguishable from the straight-time hours. Such work from the nurses' standpoint is fungible. Work is work, after all. Nurses who work overtime, at the hospitals' request, often continue doing the same kind of work they were doing on their regular shifts. In that respect we believe the district judge mischaracterized the Act when he commented that the extra or overtime work is not "work" under the statute.

9

As a threshold matter, application of the Tennessee Coal test to the facts of this case is something of a red herring. Contrary to the district court's belief, the Supreme Court's definition (with roots in Webster's Dictionary, see Tenn. Coal, 321 U.S. at 598 n.11) does not purport to establish a "special meaning" for work, but simply to guide the courts in applying the word as it is commonly used and understood, id. at 598. Further, if an activity fails the Tennessee Coal test, we understand that result to mean the activity is not work and is not compensable. Here, no party disputes that the performance of overtime at least entitled the nurses to compensation at a regular rate of pay. What Gotham implies is that the nurses' overtime belongs to a new category of exertion, call it quasi-work, that was not contemplated by the drafters of the Act and is subject to its own compensation rules.

Gotham conceded in the 1994 consent judgment and again in its appellate brief that it "employs" its nurses for purposes of the Act. The classification of the nurses' regularly scheduled activities as work within the meaning of the Act follows from this concession. See, e.g., 29 U.S.C. § 203(g) (defining "employ" to include suffering or permitting work). It is significant, therefore, that there seems to be no distinction between the exertion of Gotham's nurses during unauthorized and authorized hours. In the typical case, by contrast, the Tennessee Coal test is applied to ascertain whether an activity that is markedly different from an employee's primary activities

10

may yet qualify as work. See, e.g., Tenn. Coal, 321 U.S. at 592 (travel time to ore mines); Holzapfel, 145 F.3d at 519 (dog grooming and care by K-9 police officers); Leone v. Mobil Oil Corp., 523 F.2d 1153, 1154 (D.C. Cir. 1975) (accompaniment of federal occupational safety investigators during plant inspection).

Turning to the specific elements of the test for purposes of the case at hand, the staffing agency's contention that the overtime is not work because it does not benefit Gotham is unpersuasive. It is plain that if Gotham were not bound to comply with the Act and instead paid its nurses straight-time wages for overtime without administrative inconvenience, all hours clocked by the nurses would satisfy the benefit prong of the Tennessee Coal test. It is only by subtracting from Gotham's benefit the costs of its attempted adherence to federal law that the nurses' overtime ceases to benefit Gotham. Hence, Gotham finds itself in a situation that we suppose quite common in the business world in which the revenues gained from overtime fall short of the costs incurred. Gotham's implication that unprofitable labor is not work under the Act leads us to a number of untenable conclusions; most pertinent here, an employer would be permitted to avoid the Act whenever the overtime provisions threaten success in achieving Congress' goal of curtailing overtime by bringing its cost above its benefit to the employer.

Gotham also insists that it lacks the degree of control over the nurses' unauthorized shifts contemplated in the definition of work. We note, however, that Gotham is not permitted to supervise its nurses on hospital grounds at any time, including regular scheduled shifts, and possesses no less control over a nurse's activities during unauthorized shifts than at other times. The only discernible difference suggested by Gotham relates to the decision -- reached by the hospital and nurse without Gotham's participation -- that unauthorized work be performed. Gotham's limited control over a nurse's decision to work overtime does not change the nature of the exertion that follows and thus does not bear on whether such exertion is work. Such circumstances may be relevant to the separate question whether Gotham suffered or permitted such work, the inquiry to which we now turn.

### B. The Suffer or Permit Standard

Gotham is liable for the nurses' compensation for the overtime hours only if it employed the nurses during this time, that is, if it suffered or permitted the nurses to work. See 29 U.S.C. § 203(g).

### 1. Gotham's Knowledge

It is clear an employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work. See, e.g., Holzapfel, 145 F.3d at 524; Davis v. Food Lion, 792 F.2d 1274, 1276 (4th Cir. 1986); Forrester v. Roth's I.G.A. Foodliner, Inc., 646 F.2d

12

413, 414 (9th Cir. 1981) (explaining that knowledge affords employer the opportunity to comply with the Act).

Information that Gotham's nurses regularly worked overtime was communicated to Gotham each week on the nurses' time sheets. Gotham's insistence that it acquired its knowledge only after the fact misses the point. We have never suggested that an employer's knowledge need arise concurrently with the performance of overtime, for good reason. The Act's overtime provisions apply to work performed off premises, outside of the employer's view and sometimes at odd hours, where an employer's concurrent knowledge of an employee's labor is not the norm. See 29 C.F.R. § 785.12. It would appear impractical, for example, to require a K-9 officer to report to his supervisor before and after grooming his dog. See Holzapfel, 145 F.3d at 524; see also Reich v. Dep't of Conservation & Natural Res., 28 F.3d 1076, 1079-80, 1084 (11th Cir. 1994) (requiring overtime be paid to officers who worked in field and often at night with infrequent contact with supervisors). Moreover, a requirement of concurrent knowledge would allow employers to escape their obligations under the Act by purposefully eschewing knowledge as to when such work was performed.

We regard Gotham's knowledge as sufficient to afford it the opportunity to comply with the Act. See Forrester, 646 F.2d at 414. An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance. Reich v. Stewart, 121

13

F.3d 400, 407 (8th Cir. 1997); Forrester, 646 F.2d at 414 ("An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation . . . ."); Mumbower v. Callicott, 526 F.2d 1183, 1188 (8th Cir. 1975) ("The employer who wishes no such work to be done has a duty to see it is not performed."); 29 C.F.R. § 785.13. This duty arises even where the employer has not requested the overtime be performed or does not desire the employee to work, or where the employee fails to report his overtime hours. See Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 718 (2d Cir. 2001); Holzapfel, 145 F.3d at 524; 29 C.F.R. §§ 785.11-.12.

### 2. Gotham's Rule Against Unauthorized Overtime

Gotham endeavored to reduce unwanted overtime by promulgating a rule requiring its employees to obtain prior approval for any work that would result in overtime and informing them that, absent such approval, they would be paid straight-time wages for the ensuing overtime. We do not agree with the Secretary's interpretation of Gotham's rule as one that disclaims liability for unauthorized overtime without barring its performance outright. A straightforward reading indicates the rule serves as both a prohibition and a warning as to the consequence of its violation.

Whether Gotham's pre-approval rule satisfied its legal obligation to prevent unwanted overtime involves a question of first impression in this Circuit, complicated by Gotham's

14

limited control over the nurses. Our starting point is the Department of Labor (Department) regulation addressing such rules.

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. . . . The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13 (emphasis added); accord Reich v. Dep't of Conservation, 28 F.3d at 1084; Wirtz v. Bledsoe, 365 F.2d 277, 278 (10th Cir. 1966) ("It has long been established that the purpose of the [FLSA] cannot be frustrated by an employer's instructions or even a contract not to work overtime."). Although courts are responsible for final decisions concerning interpretation of the Act, see 29 C.F.R. § 785.2; A.B. Kirschbaum Co. v. Walling, 316 U.S. 517, 523 (1942), the Department's explanations bearing on the meaning of "suffer or permit" and "work" in §§ 785.11-.13 are entitled to our respect. Cf. Kavanagh v. Grand Union Co., 192 F.3d 269, 272 (2d Cir. 1999). The long-standing regulations in Part 785 reflect the Department's expertise on interpretive questions that are essential to the administration of the Act. Cf. Barnhart v. Walton, 535 U.S. 212, 222 (2002); Leary v. United States, 395 U.S. 6, 25 (1969).

In Reich v. Dep't of Conservation, the Eleventh Circuit adopted the position laid out in 29 C.F.R. § 785.13 and held

15

liable an employer that, like Gotham, had limited concurrent control over its employees' work schedules. 28 F.3d at 1083-84. The case involved a state agency charged with enforcing game and fish laws, which employed enforcement officers posted throughout the state. Id. at 1078. The officers, whose job it was to answer citizen complaints around the clock, worked from home under minimal supervision. Id. at 1078-79. The state agency promulgated a rule forbidding officers to work more than 40 hours per week, but had actual and constructive knowledge that some officers continued to work overtime without reporting the extra hours. Id. at 1079-80. The Eleventh Circuit concluded the agency could not avoid overtime compensation simply by adopting a policy against overtime and issuing periodic warnings. Id. at 1084.

Gotham's efforts to distinguish Reich v. Dep't of Conservation do not convince us. The staffing agency points out that the majority of employees involved in the Eleventh Circuit's case were unable to perform their duties within a 40 hour workweek, id. at 1081 & n.12, while Gotham nurses can fulfill their obligations -- at least to Gotham -- without incurring overtime. Given this difference, Gotham urges us instead to follow Lindow v. United States, 738 F.2d 1057, 1061-62 & n.3 (9th Cir. 1984), where the Ninth Circuit held an employer may insulate itself from overtime claims by notifying its employees that overtime is not expected, so long as the

16

employees can complete their duties within regular hours and are under no pressure to perform overtime.

In Lindow, employees of the Army Corps of Engineers were in the habit of arriving fifteen minutes early to exchange information with their colleagues working the earlier shift, review the log book, drink coffee, and socialize. Id. at 1059, 1061. A portion of this time was classified by the court as working time. Id. at 1059-61. The Corps issued a letter informing its employees that they were not required to arrive early, but some employees continued to do so. Id. at 1060-61. The Ninth Circuit held that the letter relieved the Corps of liability for overtime compensation because the Corps did not require or pressure the employees to work overtime and the work could have been performed during regular hours. Id. at 1061 & n.3.

In the instant case, the district court found the unauthorized shifts were controlled and required by the hospitals and by the employees. It is not obvious to us that the nurses do not on occasion work overtime because they feel unable to satisfactorily perform their duties to hospital supervisors or patients within their scheduled hours. It is plain that Lindow's rationale does not extend to employees whose jobs require them on occasion to work beyond regular hours, whether the requirement is enforced by the employer or inherent in the nature of the work. See id.

17

Even setting aside this concern and assuming that the nurses elect to work overtime without any compulsion to do so, we decline to follow Lindow. First, the Supreme Court has rejected the argument that an employer may avoid its obligations under the Act upon proof that its employees voluntarily engage in inadequately compensated work. See Tony & Susan Alamo Found., 471 U.S. at 302 ("[T]he purposes of the Act require that it be applied even to those who would decline its protections."); Barrentine, 450 U.S. at 740. More generally, as the Eleventh Circuit recognized in Reich v. Dep't of Conservation, "[t]he reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." 28 F.3d at 1082 (citing 29 C.F.R. § 785.11). In other words, once it is established that an employer has knowledge of a worker's overtime activities and that those activities constitute work under the Act, liability does not turn on whether the employee agreed to work overtime voluntarily or under duress.

Second, Lindow's holding was premised on the finding that the duties carried out during overtime could have been completed within the regular workday. 738 F.2d at 1061. We previously explained that this fact alone does not excuse an employer from the FLSA's overtime provisions. Holzapfel, 145 F.3d at 522. In addition, the scenario presented to us differs from Lindow inasmuch as the nurses who were asked to work overtime provided

18

services in addition to those performed during their regular hours and so by definition were unable to complete their work within those regular hours. Application of the Act's overtime provisions in this case would put to Gotham and its client hospitals the choice to either pay a premium for overtime or engage other nurses to provide the additional services. This choice -- which was not implicated in Lindow where the Corps presumably could have barred overtime without altering its demand for labor or budget -- plays an important role in the FLSA's incentive structure to reduce overtime, spread employment and compensate workers for the burden of long hours. See Missel, 316 U.S. at 577-78.

We are of course aware that the conditions prevailing in the present market for nurses in the United States influence the options open to Gotham and its client hospitals. We have identified nothing in these conditions to recommend carving an exception to the Act's overtime provisions, however, and will not ask nurses to shoulder the burden of the nation's nursing shortage by denying them their rights under the Act. On our reading, the FLSA presumes that employers, not employees, are in the best position to address the evils of overwork and underpay. This presumption is no less true in the nursing profession than in any other. Finally, the Supreme Court instructs that employees cannot waive the overtime protections granted them in the FLSA without nullifying the Act's purposes and setting aside

the legislative goals it wanted effectuated.  <u>Barrentine</u>, 450 U.S. at 740.

### 3.  <u>Gotham's Duty to Prevent Unwanted Overtime</u>

In an ordinary employer-employee relationship, management is believed to have ready access to a panoply of practical measures to induce compliance with its formal rule against overtime.  In such cases, a presumption arises that an employer who is armed with knowledge has the power to prevent work it does not wish performed.  Where this presumption holds, an employer who knows of an employee's work may be held to suffer or permit that work.  We suppose that this presumption explains why several cases and Department regulations seem to treat an employer's knowledge as not only necessary, but also sufficient, to establish its liability under the Act.  <u>See</u>, <u>e.g.</u>, 29 C.F.R. §§ 785.11-.12; <u>Holzapfel</u>, 145 F.3d at 524; <u>Doe v. United States</u>, 372 F.3d 1347, 1360-61 (Fed. Cir. 2004) (collecting cases).

Gotham seeks to rebut this presumption on the basis that its power to control the nurses is severely constrained by the nature of its business and the labor market in which it deals. Gotham portrays its role as nothing more than an employment agency matching the requirements of hospitals with the qualifications of nurses and maintains that it has no ability to control nurses who violate its rule.

We recognize that Gotham does not have at its disposal all the instruments of control available to ordinary employers. That said, the law does not require Gotham to follow any

20

particular course to forestall unwanted work, but instead to adopt all possible measures to achieve the desired result. See 28 C.F.R. § 785.13. Gotham has not persuaded us that it made every effort to prevent the nurses' unauthorized overtime: for example, it did not explain why it could not keep a daily, unverified tally of its nurses' hours and reassign shifts later in the week that would result in overtime; or refuse to assign any shifts to nurses who habitually disregard Gotham's overtime rule. Notably, Gotham admitted at trial that a nurse who disregards its pre-approval rule faces no adverse consequences beyond straight-time wages for the ensuing overtime, while one who disregards Gotham's other policies is subject to contractual penalties. If Gotham were serious about preventing unauthorized overtime, it could discipline nurses who violate the rule. It could also entirely disavow overtime hours, announcing a policy that it does not, under any circumstances, employ a nurse for more than 40 hours in a week. Any hours over the limit would not be billed to the hospital and would not result in any compensation for the nurse (as opposed to the current policy of regular pay). Alternatively, Gotham could simply contract in advance with the hospitals to charge a higher fee when nurses are working overtime, thus shifting the decision to those best placed to judge when overtime is cost-effective and avoiding the need for an anti-overtime policy to begin with.

We confess we are skeptical whether an employer with full knowledge respecting the activities of its employees ever lacks

21

power, at the end of the day, to require those it retains to comply with company rules that implicate federal law. Gotham in any event has not overcome the presumption here that it possessed such power. It follows that Gotham suffered or permitted the nurses' overtime and, by failing to compensate them in accordance with 29 U.S.C. § 207(a), violated the Act and the 1994 consent judgment.

III Denial of Petition for Contempt Affirmed

We turn now to whether that violation subjects Gotham to being held in contempt. A federal court has the authority to punish contempt of a consent decree. United States v. Int'l Bhd. of Teamsters, 899 F.2d 143, 146 (2d Cir. 1990). However, the judicial power of contempt is circumscribed and "[t]he failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt." Dunn, 47 F.3d at 490. A party may be held in civil contempt only where a plaintiff establishes (1) the decree was clear and unambiguous, and (2) the proof of non-compliance is clear and convincing. Id. Although the defendant's conduct need not be willful, a plaintiff must also prove that (3) the defendant has not been reasonably diligent and energetic in attempting to comply. City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n, 170 F.3d 279, 283 (2d Cir. 1999); Dunn, 47 F.3d at 490; see also Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002) (noting plaintiff's burden of proof). While we disagreed with the district court's determination that the unauthorized work

22

was not compensable as overtime, we now affirm its alternative holding that the Secretary did not carry her burden to prove contempt.

A. The Decree Was Ambiguous with Respect to Gotham's Conduct

The Supreme Court has cautioned that contempt is a powerful weapon under any circumstance and, when founded on a decree that the defendant could not comprehend, it can be a ruinous one. Int'l Longshoremen's Ass'n v. Phil. Marine Trade Ass'n, 389 U.S. 64, 76 (1967). To ensure fair notice to the defendant, the decree underlying contempt must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do. King v. Allied Vision Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995); N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1351-52 (2d Cir. 1989); see also Fed. R. Civ. P. 65(d) (requiring injunctive orders to be "specific in terms" and "describe in reasonable detail . . . the act or acts sought to be restrained"); Phil. Marine, 389 U.S. at 74-76 (reversing contempt based on injunctive decree that did not satisfy the specificity and clarity requirements set forth in Rule 65); Int'l Bhd. of Teamsters, 899 F.2d at 146.

We agree with the Secretary that the incorporation into the consent judgment of certain provisions of the FLSA does not, by itself, render the decree ambiguous. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191-92 (1949). The proper measure of clarity, however, is not whether the decree is clear in some general sense, but whether it unambiguously proscribes the

23

challenged conduct. Perez v. Dansbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003). If, as we believe to be the case here, the law relied on by the party seeking contempt is ambiguous in its application to the challenged conduct, contempt will not lie. See, e.g., Rajah Auto Supply Co. v. Grossman, 207 F. 84 (2d Cir. 1913) (per curiam) (affirming denial of contempt motion where plaintiff's case was too doubtful on the facts and the law to warrant contempt); United States ex rel. IRS v. Norton, 717 F.2d 767, 774 (3d Cir. 1983) ("[A]ny ambiguity in the law should be resolved in favor of the party charged with contempt."); Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 16 (1st Cir. 1991) (stating prudential rule that ambiguities in court orders should be read in light favorable to party charged with contempt); cf. Vertex Distrib. v. Falcon Foam Plastics, Inc., 689 F.2d 885, 889 (9th Cir. 1982) (explaining that party should not be held in contempt if his actions appear based on a good faith and reasonable interpretation of the order).

It should be apparent that the novel question addressed above, whether employees must be paid overtime wages for work that their employer has prohibited and does not desire, was not the subject of an obvious answer. On the contrary, when the Secretary brought its petition for contempt to the district court, there was a substantial question as to the legality of Gotham's overtime arrangement and "fair ground of doubt as to the wrongfulness of the defendant's conduct." Cal. Artificial

24

Stone Paving Co. v. Molitor, 113 U.S. 609, 618 (1885); King, 65 F.3d at 1058.

From another angle, it seems unreasonable that Gotham be required, on pain of contempt, to arrive at a correct answer to such a difficult question of first impression. See Radio Corp. of Am. v. Cable Radio Tube Corp., 66 F.2d 778, 782-83 (2d Cir. 1933) (noting potential unfairness to defendant where contempt proceedings used to resolve substantial dispute); United States v. Acetturo, 842 F.2d 1408, 1416 n.4 (3d Cir. 1988) (suggesting trial court consider relief from contempt in circumstances of case of first impression). But cf. Apple Computer, Inc. v. Formula Int'l, Inc., 594 F. Supp. 617, 623 (C.D. Cal. 1984) (issuing contempt order despite novel nature of underlying legal issue after finding defendant's alleged interpretation was a "mere pretext" to avoid an injunction).

B. Gotham Was Reasonably Diligent in Attempting to Comply

Additionally, Gotham's efforts to comply with the consent judgment were adequate to warrant relief from contempt. We have noted already that the staffing agency's legal obligations were difficult to discern and its managerial role vis-à-vis the nurses made compliance more challenging than would be the case in an ordinary employment context. See Dunn, 47 F.3d at 490 (affirming trial court's denial of petition for contempt where situation faced by defendant was complex and largely outside its control). Against that backdrop, Gotham sought the advice of counsel before adopting its overtime policy; it made its nurses

25

aware of the rule; it discouraged its nurses from accepting overtime shifts without seeking prior approval and discouraged its clients from offering those shifts; and, when its instructions were disregarded, it negotiated with the hospitals to procure an overtime premium retrospectively. While these steps did not exhaust all means available to Gotham to ensure that overtime was not performed (and thus were inadequate to satisfy the strict standards for compliance with the Act), they are evidence of Gotham's diligent and energetic efforts to comply in a reasonable manner with the 1994 consent judgment.

Consequently, we conclude the district court acted within its discretion in declining to impose contempt under a decree that did not, at the relevant time, unambiguously proscribe Gotham's actions and, one, moreover, with which the employer attempted to comply in a reasonable manner.

## CONCLUSION

For these reasons, the judgment of the district court denying the Secretary's petition for civil contempt is affirmed.

DENNIS JACOBS, Chief Judge, concurring in part and concurring in the judgment:

The district court entered a consent decree requiring Gotham Registry, a staffing agency for healthcare professionals, to comply with the overtime requirements of the Fair Labor Standards Act ("FLSA") for nurses it "employ[s]." The only question presented on this appeal is whether we should affirm the ruling by the district court, which is presumed to know its own injunction, that Gotham is not in contempt. See JTH Tax, Inc. v. H & R Block Eastern Tax Svcs., Inc., 359 F.3d 699, 705 (4th Cir. 2004).

The majority agrees that Gotham is not in contempt. I concur in that result, because it is obvious to me that Gotham was not in violation of the FLSA when it refused to pay overtime to employees whom it forbid to work overtime, and (when they violated their employer's instructions) were not acting as employees under the relevant Tennessee Coal test. I cannot sign the majority opinion because it holds that Gotham's practice violates the FLSA--though Gotham could not be expected to know this until so advised by the majority's ambitious, consequential and dubious rulings.

The correct test for whether Gotham must pay overtime is set out in Tennessee Coal: whether the work was

27

"controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tenn. Coal, Iron & RR. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944). The majority recites the test, duly records the district court's findings as to each prong, and concedes that "we detect no clear error in these factual findings . . . ." Maj. Op. at 9, supra. It would seem that if this Court were going to transcend the question presented and gratuitously answer an underlying question (Were the nurses acting as employees when they did what the employer forbid?), it might content itself with the formulation of the Supreme Court and findings of an experienced district judge. The justification offered by the majority opinion is that "application of the Tennessee Coal test to the facts of this case is something of a red herring." Maj. Op. at 10, supra. I do not find this ichthyological approach useful.

Tennessee Coal prescribes a two-part definition of "work" under the FLSA: an employee's efforts (1) must be "controlled or required by the employer" and (2) "pursued necessarily and primarily for the benefit of the employer and his business." Tenn. Coal, 321 U.S. at 598 (emphasis added).

28

As to control: the district court found that Gotham lacked control over the nurses' performance of unscheduled shifts, that nurses and hospitals decide whether overtime will be performed based on their own interests, and that Gotham does not desire the performance of overtime. Q.E.D. Though conceding that a nurse's decision to work overtime is "unauthorized work" that is "reached by the hospital and nurse without Gotham's participation," Maj. Op. at 12, supra, the majority argues that such "limited control [sic] . . . does not change the nature of the exertion that follows and thus does not bear on whether such exertion is work." Id. This is an extreme simplification--and useless, because the necessary analytical tools are readily available in Tennessee Coal and in Labor Department regulations.

The applicable regulation requires that an employer "exercise its control and see that the work is not performed if it does not want it to be performed": "[t]he mere promulgation of a rule against such work is not enough." 29 C.F.R. § 785.13. To this we owe Chevron deference. Gotham's preauthorization rule bars the performance of unauthorized overtime and refuses compensation at overtime rates for such unauthorized hours. Of course a rule is insufficient unless it is applied and enforced. But Gotham has enforced this rule conscientiously, as the findings of

29

the district court confirm: 75 percent of preauthorization requests are turned down, and unauthorized overtime shifts are reimbursed at the overtime rate only on the rare occasions (about ten percent of the time) when Gotham persuades the hospital to agree retroactively to an overtime rate. Gotham should not be pressed to more oppressive measures. Suspension would be ineffective because the nurses are professionals in great demand who can (and often do) work for multiple staffing agencies: there are at least 25 in competition with Gotham in the New York area alone. Gotham should not be required to rely on undercover agents to obtain advance knowledge of an unauthorized overtime shift, or on enforcers to drag nurses from the bedside of the sick. See Davis v. Food Lion, 792 F.2d 1274, 1277 (4th Cir. 1986) (holding that if required work could be performed within 40 hours, and if the employer enforced its 40-hour rule, employer lacked actual or constructive knowledge of the overtime work). The nurses' overtime efforts are therefore neither controlled nor required by Gotham.

As to the second Tennessee Coal consideration--whether the activity is "pursued necessarily and primarily" for the employer's benefit--the Secretary has demonstrated no error in the trial court's finding that the additional shifts do not necessarily benefit Gotham. The district court found

30

that the documented administrative costs alone would wipe out any remaining profit if Gotham were to pay an overtime rate on shifts reimbursed at a straight-time rate. This finding is amply supported by the record: Gotham's CEO testified that unauthorized overtime triggers additional costs such as time spent tracking, confirming, and negotiating rates for overtime hours with hospitals. No wonder Gotham forbids overtime. It cannot be said that such shifts are "pursued necessarily and primarily" for Gotham's benefit.

Under Tennessee Coal, the shifts in question were not performed in Gotham's "employ" within the meaning of the FLSA, and Gotham therefore did not violate the consent decree. In lieu of undertaking the prescribed analysis under Tennessee Coal, the majority announces the tautology that "[w]ork is work, after all." Maj. Op. at 9, supra.

The majority complains that "Gotham has not persuaded us that it made every effort to prevent the nurses' unauthorized overtime," Maj. Op. at 21, supra (emphasis added), and goes on to speculate as to how Gotham might (within the law) effectively stop it. For example, the majority cites Gotham's supposed failure to explain (though never asked) "why it could not keep a daily, unverified tally of its nurses' hours and reassign shifts later in the

31

week that would result in overtime." Maj. Op. at 20, supra. I do not understand this formulation and I would be surprised if Gotham or the nurses did. Moreover, the majority ignores the fact that nurses often work for more than one agency. The majority also taxes Gotham for its supposed failure to explain why it does not "refuse to assign any shifts to nurses who habitually disregard Gotham's overtime rule." Maj. Op. at 20, supra. In other words, Gotham could fire them. Perhaps: maybe an employer can discipline an employee for habitually staying in the operating room or on a ward. I say "maybe" because I don't know, and the reason I don't know is because this argument has not been made to us and has not been briefed by the parties and input has not been solicited from the members of the nursing profession who have the largest stake in this question. I am compelled to add that the majority does not know either, for the same reasons.

The majority next posits that "Gotham could simply contract in advance with the hospitals to charge a higher fee when nurses are working overtime." Maj. Op. at 21, supra. That of course begs the (not "simple") question of what happens when a nurse working for Gotham works at more than one hospital or when a nurse works at one or more hospitals for multiple agencies.

32

Finally, the majority opinion says that an agency can "entirely disavow overtime hours, announcing a policy that it does not, under any circumstances, employ a nurse for more than 40 hours in a week." Maj. Op. at 21, supra. Thus the majority holds that an employer can enforce its overtime restriction by paying the employee nothing at all for such hours. That may be. And this certainly will solve Gotham's problem and ensure that a staffing agency can comply with the labor laws (at least those applicable in the Second Circuit) and avoid contempt. But this holding may come as a surprise to the Secretary of Labor. And it runs counter to the position of every party; as the majority concedes, "no party disputes that the performance of overtime entitled the nurses to compensation at the regular rate of pay at least." Maj. Op. at 10, supra. My strong view is that this appellate panel should affirm the denial of contempt without reaching and deciding large underlying questions of labor law. Maybe a staffing agency can and should pay nurses zero dollars per overtime hour worked. But though as a panel-member I am drawn into a critique of the majority's unnecessary analysis, I would not decide that question on this appeal because we lack the benefit of input from the parties (and amici) and we lack findings by a district judge made on the basis of a developed record.

33

The majority opinion affirms the denial of the contempt motion, on the ground of the "then unsettled law" prevailing when Judge Stanton made his ruling. Maj. Op. at 6, supra. I agree that the law was then unsettled (though I think it is little good we have now done in that department). It is obvious that the agency system in which Gotham and many nurses operate is a preferred market mechanism of a profession whose services are much in demand. The majority has upended the way in which many nurses elect to make a living. Nurses evidently have the bargaining power to sell their services to individual hospitals without becoming employees, without joining unions, and without submitting themselves to the work schedules of wage slaves. In short, nurses use agencies to create for themselves the freedom and profit opportunities available to other professionals whose services are in great demand. The majority opinion unsettles these market arrangements.